[No. 29503. Department One. March 7, 1945.]

CLAUDE D. MOUSER, *Appellant,* v. PATRICK O'SULLIVAN, *Defendant,* RITA O'SULLIVAN, *Respondent.*[1]

[1]Reported in 156 P. (2d) 655.

*John W. Heal, Jr.,* for appellant.

*Army Seijas,* for respondent.

JEFFERS, J.—In January, 1944, plaintiff, Claude D. Mouser, instituted an action in the superior court of King county against Patrick O'Sullivan and Rita O'Sullivan, former wife of Patrick O'Sullivan, to have a certain five-acre tract of land near Renton, Washington, adjudged to be the property of plaintiff; to obtain a decree adjudging that Patrick O'Sullivan holds the property in trust for the plaintiff, requiring Patrick O'Sullivan to execute to plaintiff a proper deed to said real estate, and, further, adjudging that defendants have no right, title, or interest in or to the property.

The complaint alleged, in substance, that plaintiff is the equitable owner, and is entitled to possession, of the property in question; that, on or about December 14, 1937, he purchased from Anne G. Merrick, Lue Merrick Bailey and Harlan Bailey, her husband, said real estate under a real estate contract for one hundred fifty dollars, payable in installments; that, for the convenience of the plaintiff, defendant Patrick O'Sullivan attended to the details of the purchase and had himself designated as vendee in the contract, but that the money which he used for the purchase of said property was solely from the funds of plaintiff and for plaintiff's use and benefit; that, after the sum of one hundred fifty dollars and interest had been paid by plaintiff, the deed to the property was taken in the name of defendant Patrick O'Sullivan, as grantee; that said deed was recorded by O'Sullivan for the use and benefit of plaintiff, and that the filing fee was paid by plaintiff.

The complaint also alleged that, after the purchase of this property, plaintiff advanced approximately one thousand dollars for material for buildings to be erected on the property, the details of the purchase being handled by O'Sullivan, for plaintiff, as a matter of convenience; that the material was expressly purchased for a garage, a

chicken house, and a three-room dwelling, which were built by plaintiff at his own cost and by his own labor.

The complaint further alleged that defendant Rita O'Sullivan claims some right, title, or interest in this property by reason of a certain judgment on record in King county, filed September 25, 1939 (interlocutory decree), cause No. 294485, in which Rita O'Sullivan, former wife of Patrick O'Sullivan, is plaintiff and Patrick O'Sullivan is defendant; that demand has been made upon Patrick O'Sullivan for a deed to said property and such demand refused.

Patrick O'Sullivan did not appear, and default was taken against him in this action. On February 9, 1944, Rita O'Sullivan filed an answer herein, in which she denied all the allegations contained in the complaint. On July 20, 1944, the cause came on for hearing before the court, which, after hearing testimony and arguments, made and entered a judgment dismissing plaintiff's complaint, with prejudice. Plaintiff has appealed to this court from the judgment, entered July 20, 1944. Error is assigned on the dismissal of appellant's complaint and refusal to enter judgment for appellant.

The question presented for our consideration, as stated in appellant's brief, is:

"Where A furnished the consideration for the purchase of real property, the title to which was taken in the name of B, is a resulting trust created in favor of A?"

We are of the opinion that, if any trust relationship is found to have been established by the evidence in this case, it must be a resulting trust.

In 65 C. J. 222, § 13, we find the following statement in regard to resulting trusts:

"Although the term has been broadly defined as a trust which is raised or created by the act or construction of law, in its more restricted sense and contradistinguished from constructive trusts, a resulting trust has been defined to be one raised by implication of law and presumed always to have been contemplated by the parties, the intention as to which is to be found in the nature of their transaction, but not expressed in the deed or instrument of conveyance.

Such trusts are also called 'presumptive' trusts, and are frequently defined in terms of or in connection with the character of the transaction out of which they most frequently arise, namely, where one person pays the consideration for a purchase and the title is taken in the name of another, although they may result from other kinds of transactions."

In *Scott v. Currie*, 7 Wn. (2d) 301, 109 P. (2d) 526, we stated:

"The general rule is that, when property is taken in the name of a grantee other than the person who advanced the consideration for the purchase, *in the absence of other evidence of intent*, that grantee is presumed to hold the legal title so acquired, subject to the equitable ownership of the person advancing the consideration. This trusteeship is imposed upon the nominal grantee, upon the theory that a resulting trust is presumed to have been created." (Italics ours.)

■ While not material here, we call attention to an exception to the general rule above announced, as stated in *Dines v. Hyland*, 180 Wash. 455, 458, 40 P. (2d) 140.

"Time of Creation. A resulting trust must result, if at all, the instant the title passes, and will not arise on other than the state of facts existing when the property is acquired." 65 C. J. 371, § 145.

We adopted the rule last above announced in *Belcher v. Young*, 90 Wash. 303, 309, 155 Pac. 1060, stating:

" . . . for it is one of the first principles of equity that a resulting trust arises from the acts of the parties and the implications of the law arising out of such acts, and exists from the time the legal title is taken and rests in the grantee."

See, also, *Croup v. DeMoss*, 78 Wash. 128, 138 Pac. 671; *Herriford v. Herriford*, 78 Wash. 429, 139 Pac. 212.

■ We have consistently held that, while a resulting trust in land may be proved by parol testimony, it may be established *only* by evidence that is clear, cogent, and convincing. *Croup v. DeMoss, supra; Herriford v. Herriford, supra*, and cases therein cited; *Brucker v. DeHart*, 106 Wash.

386, 180 Pac. 397; *Makinen v. George,* 19 Wn. (2d) 340, 142 P. (2d) 910.

Having the above principles in mind, let us examine the evidence in this case. The theory of the trial court, as shown by his memorandum decision, was that the burden was on appellant to establish this claimed resulting trust by evidence that was clear, cogent, and convincing, and that he had failed to sustain the burden cast upon him.

This case presents an unusual situation, in that O'Sullivan, who holds legal title to this property, did not appear in the action and make claim to the property, but when called as a witness by appellant he testified favorably to appellant's contention. Rita O'Sullivan, former wife of Patrick O'Sullivan, who obtained an interlocutory decree of divorce from Patrick O'Sullivan on September 25, 1939, and a final decree on July 23, 1943, is the real defendant and respondent.

Appellant's case is rested upon his own testimony and that of Patrick O'Sullivan. Respondent, in addition to her own testimony and that of her son, Jack O'Sullivan, called May Holder and Frank Kamins as witnesses in her behalf.

It is impossible to get a complete picture of the situation here presented, including the relationship of the parties, by taking excerpts from the testimony. But, of course, we cannot set out in this opinion other than a brief summary of the evidence.

Appellant came to Washington from California some time in 1935, and was not thereafter employed until April, 1937, when he began work on WPA. During the time just mentioned, appellant was on relief and received aid of some character down at the Blue Ox, on First avenue in Seattle.

Appellant met Patrick O'Sullivan some time in 1936, and shortly thereafter O'Sullivan employed appellant to build a trailer house. After the trailer house was completed, these two men took up their residence therein and continued to live together in this trailer house until after the purchase of the property in question and the erection of some of the buildings thereon, at which time they moved onto

the property and continued to live there, except for a time when they moved in nearer to Seattle, and except when appellant was away working.

O'Sullivan came to this country from New Zealand in 1929, and this respondent and their son, Jack, came four years later. The record does not show whether O'Sullivan and his wife, Rita, lived together after she came to this country, but we infer from this record that they did not, or at least not for any great period of time.

Respondent, Rita O'Sullivan, began an action for divorce against Patrick in 1936, obtained an interlocutory decree on September 25, 1939, and a final decree on July 23, 1943. The final decree awards Mrs. O'Sullivan custody of the minor son, Jack, and requires Patrick O'Sullivan to pay twenty dollars per month for the care of said minor. It is thus apparent that, at the time when the contract here referred to was executed (December 14, 1937), and the deed (August 11, 1939), Patrick O'Sullivan and Rita O'Sullivan were still husband and wife. Mr. O'Sullivan testified that he knew nothing about the divorce and that no papers were ever served on him.

■ While the only part of the record in the divorce proceedings that was introduced in evidence is a certified copy of the final decree, we are of the opinion, and must assume in the absence of a direct attack on said judgment, that the court had jurisdiction of the parties and the subject matter and was authorized to make such judgment. The testimony of O'Sullivan in regard to the divorce proceedings and the decree entered therein, is not convincing to us. While it is only one incident, it is a fact that Patrick O'Sullivan's testimony in regard to his reason for having himself described in the contract and the deed as a single man is also confusing and certainly not clear.

Mr. O'Sullivan does not seem to have any trade, but he works at whatever he can find to do. There is testimony to the effect that, at the time Mrs. O'Sullivan started the divorce action, Mr. O'Sullivan was working for the Quaker bakery. While the testimony is not very definite, we assume that this is the bakery where Mr. O'Sullivan worked

for about two years on a commission basis. After the appellant took up his residence with O'Sullivan in the trailer house, appellant did not work until April, 1937, when, as we have said, he began work on WPA. During all this time, Mr. O'Sullivan was working at least part of the time, and he was never on relief. According to Mr. O'Sullivan, he paid appellant a few dollars at different times for building the trailer house.

Apparently, it was Mr. O'Sullivan's idea that this property should be purchased. We quote from the direct testimony of Mr. O'Sullivan: "Q. He [appellant] did build the trailer, did he? A. Yes, then suggested about the place, a house out there." The appellant and Mr. O'Sullivan then went out and looked at this property, and the next day they went to Renton, where the contract was executed.

Appellant testified that the initial payment of twenty-five dollars was his money, earned on WPA, and that, while Mr. O'Sullivan handled the transaction, all of the payments on the purchase price were made from his, appellant's, own money, and that he, appellant, furnished the money with which the materials for the improvements were purchased; that the title to the property was taken in Mr. O'Sullivan's name because he, appellant, drinks, and when he is drinking he does not know what he is doing; that he thought, by taking the title to this property in Mr. O'Sullivan's name, he could not dispose of it and would always have a place in which to live.

Appellant testified that he did not know O'Sullivan was married at the time this property was acquired, nor until about three years before this suit was instituted, when he met the son, Jack, and O'Sullivan told him that Jack was his son. Appellant further stated that he knew nothing of this divorce until about six or seven weeks before the trial.

It does not appear that respondent knew that her husband was living on this property until about a year before the trial. She testified that as she was going along the road she saw a sign, "Eggs for sale"; that she went in, and found Mr. O'Sullivan; that he told her it was his place and that

eventually it would go to their son, Jack. O'Sullivan denied that he ever made such a statement.

In addition to the contract and the deed being in his name, O'Sullivan seems to have exercised dominion over this property at all times, in so far as the record shows. He attended to making the payments on the contract, to the purchasing of a greater part of the material that went into the buildings, and to the payment of the taxes. He stated, however, that these payments were all made with appellant's money and for appellant's benefit. During one Christmas season, at least, Mr. O'Sullivan sold four or five hundred dollars worth of Christmas trees, most of which were taken from this property, and, admittedly, no accounting of this money was ever asked for by appellant, nor ever made. The son, Jack, helped his father, one year, sell these trees, and his father gave him twenty-five cents for each tree that he sold. The boy testified that his father told him the property would be his after his father was gone.

O'Sullivan had no bank account, but his son, Jack, testified that his father had a safety deposit box; that he had gone with his father and had seen him take money out of this box. It does not appear that O'Sullivan has ever contributed anything to the support of his wife since he came to this country, nor that he has contributed anything toward the support of this minor, except a few dollars.

It is apparent, from the testimony, that O'Sullivan holds a very bitter feeling against his wife, and that she holds the same feeling toward him. May Holder testified regarding what she heard O'Sullivan say to Frank Kamins when they were all at some sale in Kent, as follows: " 'So help me God' he says 'before she will ever get any benefit of my property'—he said he would shoot her."

. Mr. Frank Kamins testified as follows, regarding the above incident:

"No, I didn't discuss it but Mr. O'Sullivan came up,—he came up to Mrs. O'Sullivan and they started an argument. Well, I didn't pay much attention to it. I finished my coffee and went out and Miss Holder was there. 'Now,' he (O'Sullivan) says, 'she makes me trouble for the last 15 years, and I swear to God Almighty, if she ever tries to

get anything out of me, I will kill her.' He raised his hand, like that (indicating)."

Mr. Kamins also testified that he promised both appellant and O'Sullivan he would try to get respondent to sign a release of the property, but that she would not sign; that she wanted her back alimony.

Mr. O'Sullivan sold the trailer house for thirty dollars, and he admitted that some of this money went into this property. The purchase price of this property was not great, and the payments to be made on the contract were small, and it is possible that either O'Sullivan or appellant had earned enough money to make these payments and to purchase the material that went into the improvements.

But, in spite of the testimony of these two men to the contrary, there is much even in their own testimony, to say nothing of the other evidence, to cause us to doubt that this property was purchased with appellant's money or that the title to the property was taken in the name of O'Sullivan for appellant's benefit. In other words, we sincerely doubt that it was the intention of these men to create a trust in favor of appellant in this property, at the time that it was acquired. We are impressed with the thought that this trust theory was conceived at the time O'Sullivan learned of the final decree, and in order to avoid the effect of it.

The trial judge was a man of long experience on the bench. He saw these witnesses and heard them testify, and, in dismissing appellant's action, he must have come to somewhat the same conclusion that we have after consideration of all the evidence in this case. Even on the cold record, we have reached the same conclusion as did the trial court.

The judgment of the trial court is affirmed.

BEALS, C. J., MILLARD, STEINERT, and GRADY, JJ., concur.