[No. 29032.   Department One.   October 30, 1943.]

ELMER MAKINEN, *as Administrator, Respondent,*
v. HELEN GEORGE, *Appellant.*[1]

[1]Reported in 142 P. (2d) 910.

*Hogan & Adams* and *Gladys Phillips,* for appellant.

*Charles E. Allen,* for respondent.

JEFFERS, J.—This action was instituted by Elmer Makinen, as administrator with the will annexed *de bonis non* of the estate of his wife, Elsie Makinen, for the purpose of obtaining a decree requiring Helen George, daughter of Elsie Makinen by a former marriage, to account for and pay over to plaintiff the proceeds of two one thousand dollar United States saving bonds, registered in the name of Mrs. Elsie Fohr Makinen, payable on death to Mrs. Helen Fohr George.

The complaint, in paragraphs one to six, inclusive, alleges the following facts, which are admitted in the answer: Plaintiff is the surviving spouse of Elsie Makinen, deceased, who died testate in Aberdeen, on February 8, 1941, being at the time of her death a resident of Seattle, and leaving an estate subject to administration of the approximate value of three thousand dollars. Decedent left surviving her as her only heirs, devisees, and legatees, Helen George, a daughter by a former marriage, and plaintiff. Helen George was nominated executrix by the will of deceased, and the will was presented by her and admitted to probate by the superior court for King county, Helen George qualifying as executrix.

As stated, the foregoing facts are admitted, as are also the following facts alleged in paragraph seven of the complaint: At the time of her death, Mrs. Makinen was possessed of a community interest in a home in Seattle, its furniture and furnishings, and a 1936 Terraplane automo-

bile. Paragraph seven also contains the following allegation, which is denied by the answer:

"That at the time of her death said decedent was possessed of . . ., as her separate property, the following described personal property [then follows a description of the two bonds here in question]."

The following are the allegations, in substance, of paragraphs eight, nine, ten, and eleven of the complaint, which are admitted by the answer: Petitioner has repeatedly demanded that Helen George account for the bonds, or the proceeds thereof, as assets of the estate, but she has surrendered the bonds for payment, received and retained the proceeds thereof. Helen George, claiming the bonds as her individual property, resigned as executrix without accounting for or paying over to plaintiff, as her successor, the proceeds of the bonds. The will of deceased left all her property to Helen George, except the nominal sum of one dollar left to petitioner.

The following allegations contained in paragraph twelve of the complaint are denied by the answer: The retention of the proceeds of the bonds is a fraud upon the rights of petitioner, as the surviving spouse, in that there are not sufficient assets in the estate to pay the expenses of the funeral, last illness, and administration, without resort to the home, its furniture and furnishings, and other community property of the estate, which petitioner, on payment of such expenses, has a right to have set aside to him as a probate homestead.

In addition to the denials hereinbefore referred to, defendant alleged affirmatively that, prior to her marriage to plaintiff, her mother, Elsie Makinen, was the owner of certain real estate in Grays Harbor county, described as the southerly 43 feet of lots 11 and 12, block 8, Weatherwax & Benn's addition to Aberdeen; that on January 23, 1934, Mrs. Makinen, for a good and valuable consideration, executed and delivered to defendant her warranty deed to such real estate, which deed was filed for record January 24, 1934; that, during the year 1937, defendant sold the prop-

erty, and with the proceeds thereof purchased the bonds described in the complaint; that at all times since defendant was and now is the owner of the bonds and their proceeds, in her own individual right.

Plaintiff by his reply admits that there appears of record a deed purporting to be a conveyance from the deceased to defendant of the property above described, but denies that the deed served to convey the property to defendant, or did, or was intended to, convey more than the mere naked legal title to the property, or was given for any reason other than the convenience of deceased.

The cause came on for hearing before the court, counsel for defendant contending, as shown by her opening statement, that defendant was the owner of the bonds on the theory of a resulting trust, plaintiff contending that a resulting trust could not exist, because to permit such a trust to be established would be in violation of the regulations of the treasury department, and a resulting trust cannot arise if the relation created is a violation of the law.

In so far as the record shows, the court, without expressing any opinion as to the above contentions, proceeded to hear the evidence, and thereafter, on January 18, 1943, made and filed a memorandum decision, which states:

"After reading the briefs in the above entitled case, together with the authorities cited therein, I am of the opinion that the case of *Decker v. Fowler*, 199 Wash. 549, is controlling. For that reason the judgment will be for the plaintiff."

Defendant moved for judgment notwithstanding the memorandum decision, which motion was denied. Defendant then proposed findings of fact, conclusions of law, and judgment, which were refused. On February 5, 1943, the court entered a decree ordering defendant to collect from the United States the proceeds of the two bonds, and account for and pay over such proceeds to plaintiff, as administrator. Defendant gave timely notice of appeal from the judgment entered.

Appellant assigns error on the denial of her motion for judgment notwithstanding the memorandum decision; on

the failure of the court to enter a judgment of dismissal upon the findings of fact, conclusions of law, and judgment proposed by appellant; and upon the entry of judgment in favor of respondent.

Appellant's theory is clearly shown on page sixteen of her brief, where she states:

"It is the contention of Helen George that the effect of the conveyance from her mother to her of January 23, 1934, was to vest in her full and complete title to the real estate conveyed and to make her the owner of the house and the proceeds from the sale of the house with which the bonds in question were purchased, and that she is, therefore, the owner of the bonds in her own individual right by virtue of a resulting trust."

On the other hand, respondent contends that as a legal proposition appellant's contention cannot prevail, as a resulting trust cannot arise if the relation created is in violation of law, arguing that to permit appellant to establish a resulting trust in the bonds would be in violation of the regulations of the treasury department, especially regulation I, relative to registration, to which we shall later refer.

On the facts, respondent argues that there is not a thing in appellant's entire testimony, except her own statement, that is not equally consistent that she acted as agent for her mother as that she acted as principal for herself. In other words, respondent argues that appellant did not establish a trust by evidence which was clear, cogent, and convincing.

Respondent begins his argument with the statement that the case of *Decker v. Fowler*, 199 Wash. 549, 92 P. (2d) 254, 131 A. L. R. 961, is determinative of the present case. We are of the opinion the *Decker* case is not controlling. In that case, the bonds in question were admittedly purchased by the deceased (Marino) with his own money. The question presented was whether or not Marino, during his lifetime, had made a valid gift of the proceeds of the bonds to Mrs. Decker, the named beneficiary, in the event of his death without having called for payment. The opinion then

proceeds upon the above theory. In discussing the rights of the beneficiary, we stated:

"Likewise, here, there is a direction to the Federal government, in the case of the death of Marino, to pay to Mrs. Decker. But this is subject to the contingency that Marino had not elected to take payment of the bonds before his death. The right of Mrs. Decker to remain as beneficiary until the bonds were either paid before or after the death of their owner, is not controlling, inasmuch as Marino had the right, during his lifetime, to call for the payment of the bonds, and, having this right, the proceeds of the bonds had not passed beyond his dominion and control during his lifetime."

It is admitted that the rule that evidence must be clear, cogent, and convincing, in order to establish a resulting trust, is the correct rule. *Brucker v. DeHart*, 106 Wash. 386, 180 Pac. 397. See, also, Restatement of the Law of Trusts, p. 1398, § 458.

We have recognized in this state that a resulting trust in property may be created in favor of one who furnishes the consideration for the purchase of such property, but has the title taken in the name of another. *In re Hammer's Estate*, 145 Wash. 322, 260 Pac. 532.

Respondent offered no evidence to support his case in chief other than the inventory and appraisement filed in the estate of Elsie Makinen during the time appellant was acting as executrix. This exhibit shows the property of the estate to consist of lot 24, block 2, Squire Park addition to Seattle, appraised at $2,000; household goods and furnishings, $300; one 1936 Terraplane automobile, $275; claim No. 622, Security Life Insurance Company of America (in liquidation) unpaid balance, $299.92; total appraised value $2,874.92.

Appellant testified, and it is not disputed, that Elsie Makinen and respondent were married in 1933; that prior thereto, in March, 1930, Elsie Makinen, then Elsie Fohr, acquired title to the southerly 43 feet of lots 11 and 12, block 8, Weatherwax & Benn's addition to Aberdeen, upon which was located a twelve-room house. At the time of acquiring

this property, Elsie Fohr was an unmarried woman, having been divorced from Mr. Fohr in 1925. Appellant was the only child of the Fohrs. Mrs. Fohr had a contract to purchase the above described property, on which she paid about seventy-five dollars per month. The money paid on this contract was largely received from renting two apartments and rooms in the house. At the time Mrs. Fohr received the deed to the property, there was a considerable balance due on a mortgage against the property, which she assumed.

During the time Mrs. Fohr was paying for the property, and up until the time she married Mr. Makinen in 1933, she worked as a waitress and was away from home the greater part of the day. Appellant did most of the work of taking care of the apartments and rooms, the furnace, and the lawn. Edna Rasanen, an aunt of appellant, testified that appellant, during this time, worked very hard.

On January 23, 1934, Elsie Makinen deeded the property to appellant, the deed being delivered to appellant and recorded January 24, 1934. The deed recited a consideration of ten dollars and other good and valuable consideration, and purported to convey title in fee simple, free from all encumbrances, except the balance due on a mortgage for the principal sum of two thousand dollars. On the date of the deed, appellant's mother also executed and delivered to appellant a bill of sale to all the household goods and fixtures located on the property.

After receipt of the deed, appellant paid the taxes on the property, as shown by tax receipts introduced in evidence; she made payments on the mortgage, and handled the property at all times in a manner consistent with her claim of ownership. Mrs. Rasanen also testified that she knew of the deed above mentioned, and knew that her sister had given the deed to appellant, because she had worked so hard in taking care of the property.

On January 16, 1937, appellant conveyed the property to Alex Hannon and wife, for a consideration of five thousand dollars. Of this amount, $3,500 was paid in cash, and the

balance of the purchase price was evidenced by a note for $1,500, secured by a mortgage on the property. The note and mortgage were in favor of appellant. Mr. Hannon testified that he paid $3,500 to appellant, and that he dealt with her in making the deal. Hannon was to pay the balance of the purchase price at twenty-five dollars per month and interest. These payments were made at the Aberdeen Savings & Loan Association. There were introduced in evidence deposit slips showing seventeen payments of something over twenty-nine dollars each, made by Mr. Hannon and credited to appellant. These payments began February 19, 1937, and ended June 16, 1938. Appellant testified that from the $3,500 cash received from the sale of the property she paid certain items, including the balance due on the mortgage of $1,671.22, in all amounting to $2,222.25. Exhibit 14 acknowledges receipt by Aberdeen Savings & Loan Association, on behalf of appellant, of the amount last above mentioned, for the purpose of paying the above items. Appellant testified that the balance of the $3,500 was received by her and placed in her safety deposit box. This balance was $1,277.75. The seventeen payments made by Hannon on the mortgage amounted to approximately $500, which sum appellant also testified she placed in the safety deposit box. It is thus apparent that, according to appellant's testimony and the record evidence, she received between $1,700 and $1,800 in cash from the sale of the property.

Appellant further testified that she took this money, and, accompanied by her mother, went to the postoffice, where she purchased the two bonds in question, having them registered in the name of her mother; that she had at all times since had possession of the bonds, having placed them in her safety deposit box.

It also appears from appellant's testimony that in 1938 she made an assignment to her mother of the balance due on the Hannon mortgage, and we find in the record deposit slips, beginning with July 23, 1938, showing that the payments made by Hannon were credited to Elsie Makinen.

On November 1, 1939, appellant executed a release of the Hannon mortgage.

Respondent argues that it is improbable that appellant would have left the above amount of money in a safety deposit box, drawing no interest. We are of the opinion that, due to the uncertain conditions which have existed, probably many safety boxes have been used as a depositary for money, and certainly this contention of respondent is not sufficient to overcome or, in our opinion, offset the direct testimony of appellant, corroborated as it is by documentary evidence.

It also appears that Mrs. Makinen had a key to this safety deposit box, which, just prior to her death, she said she was going to turn over to appellant, as she would have no further use for it. But this statement, in our opinion, does not tend to contradict any of appellant's statements.

In rebuttal, respondent introduced five letters written by Mr. Allen, attorney for respondent, the first letter, dated March 10, 1941, being directed to appellant, and the other four to Miss Phillips, attorney for appellant; also several letters written by Miss Phillips to Mr. Allen, which letters cover a period from March 10 to October 3, 1941.

Respondent argues that in none of the letters written on behalf of appellant was it claimed that appellant had furnished the money with which the bonds were purchased. Strictly speaking, that is true, although the letters all indicate that appellant was claiming the bonds, and did not consider them a part of her mother's estate.

Respondent further argues that appellant never contended that she was entitled to the bonds on any theory other than that she was the named beneficiary, until Mr. Allen's letter of September 23rd to Miss Phillips, calling attention to the case of *Decker v. Fowler,* 199 Wash. 549, 92 P. (2d) 254, and that it was after this time that appellant, being convinced she could not sustain her claim to the bonds as beneficiary, conceived the idea of a resulting trust.

It is true that, in Miss Phillips' letter to Mr. Allen under date of September 4th, she apparently rested her claim that

appellant was entitled to the bonds on the theory that appellant was the named beneficiary, and it may be true that at that time she thought that the fact that she was the named beneficiary was sufficient to establish her right to the bonds. We are not impressed with the contention that the claim now made by appellant is so inconsistent with the claims made in her letters as to cast a doubt over the claim now made. We make this statement because all of the record evidence upon which the claim of a resulting trust is based was a matter of record long before the purchase of the bonds, and because of the corroboration of appellant's testimony by other witnesses. We do not find in these letters any admission that the bonds belonged to deceased.

Appellant, on cross-examination, was interrogated in regard to a conversation had in the office of Mr. Allen, in Seattle, shortly after Mrs. Makinen's death. Appellant was asked if at that time her claim to the bonds was based only on the fact that she was the named beneficiary, to which she answered: "No, they were mine." She was then asked, "You never claimed the bonds at that time because you paid for them?" and she answered, "Oh, yes, I did."

Appellant further testified that on that visit to Mr. Allen's office they talked about her mother's will, the bonds, and the home in Seattle, but she did not remember just what was said.

Mr. Makinen was called by respondent in rebuttal. We quote from his testimony:

"Q. (by Mr. Allen) Mr. Makinen, do you recall coming to my office shortly after Mrs. Makinen's death in company with Helen George and Mr. George? A. Yes, I do. Q. What was the conversation there at that time as nearly as you remember it? A. Well, Mr. and Mrs. George come to my house and they come into my house and Mrs. George told me, 'We come in here to try to get some settlement of this case.' I said, 'That is very nice.' I asked Mrs. George how much money my wife and your mother, how much money she have in Aberdeen, and Mrs. George told me she had two thousand dollars government bonds. Well, I says, 'We had better go to Mr. Allen's office and talk about this, try to get some settlement,' and we come in the office.

Q. Well, what was said in my office? A. I don't remember really what she say, but all I remember you make some questions, of course, and she get kind of mad, you know. I don't hardly remember what she say. Q. Were the bonds mentioned? A. I think so. Q. Did she make any proposition about the estate at that time? A. I don't remember; I don't think so."

It is apparent that Mr. Makinen did not remember what, if anything, was said by appellant in Mr. Allen's office. Appellant denied making the statement in Mr. Makinen's home to the effect that her mother had two thousand dollars in bonds in Aberdeen. Appellant was then asked:

"Q. Did you talk to Mr. Makinen at that time about the bonds? A. Yes. Q. What did you tell him about the bonds? A. I told him,—we went up there and I said, 'I brought up the will, my mother's will.' He saw it and he didn't ask me anything. And I said there isn't anything else, but I have my bonds, which belong to me."

Some claim is made that the deed from appellant's mother to her did not convey other than the naked legal title, and was made for the convenience of Mr. Makinen. But there is no testimony to sustain this contention. The deed, as we have said, purported to pass full title to appellant. A deed is presumed to be that which it purports to be, and the burden is on the one asserting otherwise. When a deed sufficient to vest title is executed and delivered, the law raises the presumption of an intent to pass the title in accordance with its terms, and the burden rests on the one who avers a different intention. 26 C. J. S. 585, § 181.

Appellant's actions at all times subsequent to the acquisition of this property from her mother were consistent with her claim of ownership. We are of the opinion that appellant established ownership in the bonds on the theory of a resulting trust, by evidence which is almost conclusive and must prevail herein, unless it appears that the relation so created is in violation of law.

Respondent contends that to permit a resulting trust to be shown in this case would be a violation of the regulations of the treasury department governing United States

savings bonds, especially regulation I, in regard to "Registration," which provides in part:

"1. The form of registration used should express the actual ownership of and interest in the bond and, except as otherwise specifically provided in these regulations, the Treasury Department reserves the right to treat as conclusive the ownership of and interest in the bond expressed in the registration. No designation of an attorney, agent, or other representative to request or receive payment on behalf of the owner may be made in the registration. . . . Registration will not be permitted in a form which purports to restrict the right of the owner or other person named in the registration to receive payment of the bond in accordance with these regulations." Federal Register 1938, vol. 3, p. 3128.

We also call attention to regulation II, "Limitation on Transfer":

"1. *Not transferable.*—A United States Savings Bond is not transferable and is payable only to the owner named thereon except in the case of disability or death of the owner or as otherwise specifically provided herein, but in any event only in accordance with the provisions hereof. Accordingly, a savings bond is not suitable for use as collateral for a loan." Federal Register 1938, vol. 3, p. 3129.

Regulation III. "Limitation on Holdings":

"1. *Amount which may be held.*—Section 22 of the Second Liberty Bond Act, as amended, provides that it shall not be lawful for any one person at any one time to hold savings bonds issued during any one calendar year in an aggregate amount exceeding $10,000 (maturity value). Under this provision any one person may hold up to $10,000 (maturity value) of savings bonds issued during any one calendar year and up to an additional $10,000 (maturity value) issued in any other calendar year (January 1 to December 31), so long as these bonds are offered for sale." Federal Register 1938, vol. 3, p. 3129.

There are other regulations relative to general payment provisions, beneficiaries, and judicial proceedings, which we shall not set out, inasmuch as respondent has limited his argument to regulations I and III.

It may be admitted that the above regulations were pro-

mulgated pursuant to Public Laws of 1935, chapter 5, § 6; 49 Stat. at Large, p. 21; 31 U. S. C. A., § 757(c) (as it appeared prior to later amendments), and that they have the force of law.

Respondent argues that if the bonds in question did not express the actual ownership of and interest in the bonds, then the provisions of regulation III, relative to the limitation on holdings, could be easily evaded.

█ It is impossible to state a definite rule which will determine in all cases whether a resulting trust will be enforced or not, since the court will consider all the circumstances involved in a particular case. See comment "a", § 422, p. 1302, Restatement of the Law of Trusts.

Under comment "a", § 60, p. 187, we find the following:

"a. *Kinds of illegality.* An intended trust or a particular provision in the terms of the trust may fail for illegality where (1) the performance of the intended trust or of the provision involves the commission of a criminal or tortious act by the trustee; (2) the enforcement of the intended trust or provision would be against public policy, even though its performance does not involve the commission of a criminal or tortious act by the trustee; (3) the purpose of the settlor in creating the trust is to defraud creditors or other third persons; (4) the consideration for the creation of the trust is illegal."

█ Among the factors which are or may be of importance in determining whether a resulting trust arises in favor of the settlor where he transfers property on an intended trust which fails for illegality, are the following: (1) Whether the settlor's conduct involves serious moral turpitude; (2) the extent of the policy of the law making the transaction illegal. See comment "b", § 422, p. 1303, Restatement of the Law of Trusts.

One of the most common situations presented, where what we shall term the "illegal purpose rule" is applied, is that in which the purchaser of property takes title in the name of another for the purpose of defrauding his creditors. See comment "b", § 444, p. 1360, Restatement of the Law

of Trusts. Under comment "d" to the section last referred to, we find this statement:

"If a person who is not entitled to acquire government land pays the purchase price for such land and takes title to the land in the name of another *for the purpose of defrauding the government,* he cannot enforce a resulting trust in his favor, even though the government does not take any steps to set aside the transaction for fraud." (Italics ours.)

The case of *Jackson v. Miller,* 6 Wendell (48 N. Y.) 228, 21 Am. Dec. 316, cited by respondent, is one in which the rule last hereinabove set out was applied. In the cited case, the name of Miller was made use of in a patent to obtain a grant of land for the benefit of one Jessup. *The transaction was entered into with intent to defraud the government,* in that, by the method attempted to be used, Jessup would be able to obtain a larger grant than he was entitled to under the law.

There is no testimony in the instant case which even tends to show that appellant, in purchasing the bonds and having them registered in her mother's name, did so with intent to evade any regulation of the treasury department, or with intent to defraud the government or any person or persons. It is not contended that appellant claimed or owned more than the two bonds here involved.

The case of *Irons Inv. Co. v. Richardson,* 184 Wash. 118, 50 P. (2d) 42, cited by respondent, while not involving the question of a resulting trust, does present another typical situation, where the illegal purpose rule is applied. This case deals with the question of the right to recover a real estate broker's commission. The statute in force at that time made it unlawful for any person to engage in the business or act in the capacity of a real estate broker, without first obtaining a license so to do. We held that the services of plaintiff were illegal, in that its acts were performed at a time when it had no license to act as a real estate broker, and that, as its claim for a commission was based upon an illegal act, it could not recover.

It will be noted that regulation I of the treasury department, relative to registration, does not expressly declare that it shall be unlawful to register such bonds in the name of one other than the real owner. Nor do we find any general regulation declaring that it shall be unlawful for any person to have bonds registered in the name of one other than the true owner. The only act declared by the regulation to be unlawful is where one person holds at any one time savings bonds issued during any one calendar year, in an aggregate amount exceeding ten thousand dollars.

A third situation is presented by the case of *Wright v. Corbin*, 190 Wash. 260, 67 P. (2d) 868, also cited by respondent. This case is typical of those cases wherein it has been held that the transaction (usually a contract, as in the cited case) is so plainly against public policy and good morals that the law will not step in to enforce the rights of either party, but will leave them where it finds them.

We have been cited to no case wherein a claimed violation of the terms of regulation I was decided by the court to be against public policy. It may be admitted that the regulations above referred to express the policy of the treasury department, but, in the absence of authority to the contrary, we are of the opinion that these regulations do not show such a public policy as to warrant the court in refusing to enforce a resulting trust because so to do would be against public policy.

Public policy in its broad sense is that principle of law holding that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. See Words & Phrases (Perm. ed.), vol. 35, p. 274 *et seq.*

While the rule invoked by respondent is sound in principle, it should be applied with caution, resulting, as it often does, in unjust enrichment of one who is also a party to the claimed illegal transaction.

We have been cited to no case, and we have found none, where the rule contended for by respondent has been applied and relief denied, except in those cases where it

appears that the one seeking to enforce the trust entered into the transaction with the intent to evade the law for a fraudulent purpose, or where the transaction is expressly declared unlawful, or where the transaction is so against public policy and sound morals that the law will not lend its aid to either party.

In his complaint, respondent alleged that to permit appellant to prevail in this action would be in fraud of his rights as the surviving spouse. Assuming as we do that the separate property of respondent's deceased wife is liable for the payment of the expenses of her last illness, her funeral expenses, etc., we are unable to see, under the facts of this case, where any fraud was intended to be or was perpetrated upon respondent. The money with which the bonds were purchased was appellant's money, and, in so far as the bonds themselves show, respondent had no interest in the bonds. It is apparent that only by having the bonds declared to be a part of his deceased wife's separate estate could respondent obtain any benefit from their proceeds.

We conclude that the resulting trust herein did not fail for illegality, and that it should be enforced as contended for by appellant.

In view of the fact that the conclusions reached by us on the questions discussed are decisive of the case, we do not deem it necessary to pass upon the other questions raised by appellant.

The judgment of the trial court is reversed and remanded, with instructions to dismiss the action.

SIMPSON, C. J., STEINERT, ROBINSON, and GRADY, JJ., concur.