[No. 7346–0–I. Division One. September 2, 1980.]

ROBERT W. GOLBERG, ET AL, *Respondents,* v. JOHN SANGLIER, ET AL, *Appellants.*

180

*Edwards & Barbieri, Malcolm L. Edwards,* and *John M. Woodley,* for appellants.

*Shidler, McBroom, Gates & Baldwin, James R. Irwin, Creighton, Scott & Schmitt,* and *Gordon L. Creighton,* for respondents.

SWANSON, J.—This appeal arises from an action commenced on March 30, 1978, by Robert and Peggy Golberg and Miriam Pierce against John Sanglier and his wife, Nick Carras and his wife, and Sanglier Cadillac–Oldsmobile, Inc. The plaintiffs' complaint alleged and claimed in part that Robert Golberg, Miriam Pierce, John Sanglier, and Nick Carras had entered into a partnership in 1974; that Sanglier and Carras thereafter successfully conspired to defeat the other partners' interests; that Sanglier and Carras obtained a dissolution of the partnership by means of fraud and misrepresentation; that Sanglier and Carras breached their partnership agreement and their fiduciary duties as partners; and that Sanglier and Carras violated RCW 21.20.010 of the Washington state securities act by inducing Pierce and Golberg to sell their partnership interests, all as a result of which entitled plaintiffs to rescind the sale of their partnership interests or, in the alternative, to damages. The defendants denied the foregoing and, by way of affirmative defense, claimed that the plaintiffs breached and abandoned the alleged partnership agreement; that the plaintiffs

came into court with unclean hands; and that the plaintiffs were in pari delicto with the defendants in an illegal agreement, which barred the plaintiffs from relief.

Following a 5–week trial to the court, the trial court entered judgment for each plaintiff in the amount of $261,917.32, together with attorneys' fees and costs, based on its conclusions that the defendants violated the securities act and breached the parties' partnership agreement and their fiduciary duties as partners. Damages were calculated as of the date of the plaintiffs' discovery of the defendants' breaches.

The defendants appeal and the plaintiffs cross–appeal. They raise 10 issues that primarily involve whether a partnership existed; whether the defendants had standing to raise the alleged partnership's illegality; whether the parties' partnership agreement is illegal, and, if so, whether it should be enforced; and whether the trial court correctly determined the nature and amount of damages. For reasons that will appear, we limit our discussion to the primary issue of whether the plaintiffs' claim for relief is foreclosed by the common law doctrine of illegality.

The history of this case covers a 4–year period. The following recitation of the facts pertinent to the illegality issue and necessary to an understanding of the posture of this case is based on the trial court's findings.

In March of 1974, John D. Sanglier contacted Robert Golberg, a real estate broker, about investing in a partnership to acquire the Cadillac dealership in Bellevue, Washington. Sanglier, formerly the general sales manager for Carras Cadillac, Inc., which had voluntarily terminated its franchise with General Motors in early 1974 and gone out of business, had filed an application for the Cadillac dealership with General Motors sometime in 1973. Sanglier told Golberg that he was the primary candidate for the franchise and that he needed $100,000 of unencumbered funds to invest in the dealership in order to obtain financing from the Motors Holding Division of General Motors (Motors Holding).

The Cadillac Division and Motors Holding, which assists General Motors dealers by providing up to 75 percent of a dealership's initial capital requirements, both require that the dealer own free and clear 25 percent of the capital required for a dealership. Motors Holding then becomes the majority stockholder and the only voting stockholder.

Golberg contacted Miriam Pierce, a real estate broker and business manager. In early April of 1974 they both agreed to invest $50,000 in a 3–way partnership with Sanglier. On April 5, Sanglier, Pierce and Golberg met with an old friend and legal advisor of Pierce's in Tacoma to discuss the mechanics of forming a partnership. The plan then existing was that Pierce and Golberg would each invest $50,000 for a 25 percent interest in the partnership. Sanglier, who would make no capital investment and be the dealer, would have a 50 percent interest. Sanglier told Pierce and Golberg that Motors Holding would finance the balance of the money needed.

On April 8, 1974, Pierce gave Sanglier a check for $50,000. Shortly thereafter, Nick Carras was invited to and agreed to join the partnership. In late April, Carras and Golberg gave Sanglier a total of $50,000 in exchange for Sanglier's promissory notes.

In May of 1974, Pierce, Golberg, Sanglier and Carras went to the offices of their attorney in Tacoma. They there conferred with his partner concerning the requirement imposed by the Cadillac Division and Motors Holding that Sanglier put up $100,000 of his own unencumbered funds. The parties discussed the fact that Motors Holding and Cadillac should not know of the true source of Sanglier's funds, and that Sanglier had already represented to Cadillac Division and would represent to Motors Holding that the funds were a gift from his mother–in–law. The attorney advised the parties that what they were doing might be a misrepresentation to the Cadillac Division and Motors Holding. Also discussed was a requirement that Sanglier carry life insurance in the sum of $200,000 on his life for the benefit of the other three; that none of the other three

could be the named beneficiary of the policy; and that the named beneficiary should be Sanglier's wife.

Motors Holding subsequently decided that it would be necessary to put the Cadillac franchise together with the Oldsmobile franchise, thereby requiring Sanglier's capital requirement to be increased from $100,000 to $125,000 of his own unencumbered funds. In July of 1974, an agreement was entered into to purchase the Carras Cadillac, Inc., real property, buildings, and equipment for $950,000. Pierce, Golberg, and Carras each agreed to and did contribute their pro rata share of the additional $25,000, making each individual's capital investment $41,666 after adjustments.

On August 27, 1974, Sanglier Cadillac–Oldsmobile, Inc., a Delaware corporation, was formed by Motors Holding Division and became the franchisee under a general sales and service agreement with the Cadillac Division and Oldsmobile Division of General Motors Corporation. Motors Holding required Sanglier to acknowledge that the $125,000 invested by him was his own money free and clear of any present or future right, claim or interest of any kind. Sanglier did so. The remaining $645,000 came from the Motors Holding Division of General Motors.

Sanglier Cadillac–Oldsmobile, Inc., had preferred stock and two classes of common stock, Class A and Class B. Of the $645,000 coming from Motors Holding, $160,600 was a loan to Sanglier Cadillac–Oldsmobile, Inc. Motors Holding purchased 1,607 shares of Class A common stock for $160,700 and 3,227 shares of preferred stock for $323,700. Sanglier from the $125,000 purchased 937 shares of Class B common stock for $93,700 and 313 shares of preferred stock for $31,300. Two employees of Motors Holding controlled the Board of Directors of Sanglier Cadillac–Oldsmobile, Inc. Sanglier Cadillac–Oldsmobile, Inc., hired Sanglier as its president at a salary which netted $1,400 per month and it also entered into a bonus agreement which would give Sanglier additional income based on the profitability of the corporation.

On December 1, 1974, Sanglier, Pierce, Golberg, and Carras executed a document titled "Partnership Agreement." The document was drafted by one of the Tacoma attorneys, was intended to embody the parties' complete agreement, and established the parties' relationship. The trial court found that the document is a partnership agreement, and that

[i]n entering into this agreement they intended to enter into a partnership relationship. [Golberg's, Pierce's] and Carras' investment was for an interest in a partnership. There was no provision for repayment, or interest on the money invested, and in the event the business failed, neither Sanglier nor the partnership had an obligation to repay [Golberg's and Pierce's] investment.

Finding of fact No. 15 in part. The trial court further found,

The investment of $41,666 by Pierce, Golberg and Carras was an investment of "risk capital" in a partnership with the expectancy of profit to come solely from the efforts of John Sanglier, who was to be the dealer under the franchise agreement with General Motors and the president of the corporation formed to operate the dealership. The management of the dealership corporation was by Sanglier.

Finding of fact No. 14. The partnership agreement provided that it should remain undisclosed and that none of the profits would be shared by any of the partners until Motors Holding had been paid in full. The agreement further provided that

John Sanglier during the period which Motors Holding Division holds incidents of ownership in Sanglier Cadillac Oldsmobile, Inc., shall devote all dividends, and at least one half of his bonus and as much of the other one half of his bonus as is not necessary to pay his tax liabilities on the dividends and bonuses, to the purchase of Motors Holding Division's stock in Sanglier Cadillac Oldsmobile, Inc. or notes issued by Sanglier Cadillac Oldsmobile, Inc. as required under the Plan. However, John Sanglier, shall retain his salary from Sanglier Cadillac Oldsmobile Inc. for devoting full time to the management of that business.

All stock and notes purchased by Sanglier were required to be placed in escrow. When Motors Holding had been paid, Sanglier would transfer the corporation's stock to the partnership. Each partner would then bear 25 percent of the partnership profits and losses.

Sanglier and Carras told the other partners and the Tacoma attorneys that the partnership could not be disclosed until Motors Holding had been paid, at which time disclosure of the partnership could be made because General Motors would then permit ownership of the agency on the basis proposed. The trial court found that Golberg and Pierce "did not at any time intend to enter an illegal contract or to damage Motors Holding or General Motors." Finding of fact No. 12 in part.

In the fall of 1975 the partners met to discuss a possible sale of the dealership to George Platis. George Platis and his financial investor, Harry Stuchell, owned a Datsun agency in Bellevue. In the late fall of 1975 or early January 1976, Sanglier told Golberg that the proposed sale to Platis was off.

Unknown to Pierce and Golberg, Sanglier subsequently continued to negotiate with Platis and Stuchell. In July of 1976, Sanglier, individually and as agent for Sanglier Cadillac–Oldsmobile, Inc., entered into an option agreement to sell Platis and Stuchell the assets of the dealership. Sanglier received $165,000 in option money. Carras knew of the option agreement and Sanglier's receipt of the option money.

On or about July 6, 1976, Sanglier and Carras agreed that if Sanglier paid Carras $70,000 from the option money ($41,666 for his partnership interest, plus $28,344 as repayment for some outstanding loans), Carras would sell his interest in the partnership to Sanglier and assist him in buying out the other two partners. After paying Carras $70,000, Sanglier used the balance of the option money for his own personal use. Golberg and Pierce were not told of Sanglier's option agreement or his agreement with Carras.

Pierce had been unable to obtain any financial information about the dealership from Sanglier.

Between July 6, 1976, and December 20, 1976, Carras attended four meetings of the partnership with the three remaining partners. He participated in discussions of partnership affairs and stated that he was still a partner; that Sanglier was mismanaging the business, not acting in the best interests of the partnership, and drinking and gambling excessively; and that the partners would be lucky to even get their money back.

On or about December 15, 1976, Sanglier, with Carras cosigning, borrowed $85,000 from Rainier National Bank. At a meeting of the partnership on December 20, Sanglier pretended to buy out the interests of all three of his partners by giving Pierce, Golberg, and Carras each a check for $41,666. Carras had already been paid and had agreed in advance to tear up his $41,666 check. Sanglier and Carras willfully concealed and failed to disclose that the source of the checks was the loan obtained on the strength of Carras' cosignature. Carras drafted and the parties signed a document at the meeting purporting to "terminate, dissolve and wind up" the partnership "dated December 1, 1974."

In March of 1978, Golberg and Pierce found out about the option agreement and money. Sanglier then orally offered Golberg the opportunity for him and Pierce to come back in if they would return the $41,666, pay their pro rata share of his start–up costs and premiums, and sign on the contingent liability of the dealership that Sanglier was personally guaranteeing. Golberg and Pierce refused this offer.

The contemplated Platis–Stuchell transaction was never consummated. Sanglier repaid the $165,000 option money in May of 1978.

On the basis of the foregoing facts, the trial court entered the following conclusions of law pertinent to our resolution of the illegality issue:

2. The Washington State Securities Act (RCW 21.20 et. seq.) applies to the purchase by defendant Sanglier of plaintiffs' interest in the partnership. Plaintiffs' interest

was a security in the nature of an investment contract as defined in RCW 21.20.005(12). Defendants violated the provisions of RCW 21.20.010, and are liable to plaintiffs for damages, including reasonable attorneys' fees and costs. The provisions of the State Securities Act applies retroactively.

. . .

10. The partnership agreement was not an illegal contract, and that defense is personal to Cadillac Division and Motors Holding.

11. Defendants have no standing to assert an alleged misrepresentation by Sanglier to General Motors or to Motors Holding to obtain the franchise or financing for the dealership. Motors Holding has been paid in full and there has been no showing of any damage to General Motors, or to Motors Holding, who are not parties to this lawsuit.

12. The alleged misrepresentation to General Motors, or to its Motors Holding Division, involved a matter of company policy and does not constitute a violation of any state statutes.

13. Plaintiffs were not *in pari delicto* with defendants Sanglier and Carras.

The trial court further concluded that Sanglier held Carras' partnership interest as constructive trustee for the partnership, and that each plaintiff was entitled to damages equal to one–third the fair market value of the dealership/partnership as of the date of their discovery of the defendants' breach of the securities act and their fiduciary duties as partners, less offsets, plus reasonable attorneys' fees and costs. This appeal followed.

Defendants contend that the trial court erred in concluding that the partnership agreement is not an illegal contract; that the defense of illegality is personal to Cadillac Division and Motors Holding; that the defendants have no standing to assert the defense of illegality; that Sanglier's alleged misrepresentations to General Motors and Motors Holding violate no state statutes; and that the plaintiffs were not in pari delicto with the defendants. The defendants' claims of error present the issue we believe is decisive

in considering this appeal—whether the common law doctrine of illegality defeats plaintiffs' lawsuit.

The defendants argue that the plaintiffs are precluded from seeking the aid of the court because they advanced funds to Sanglier knowing that he had misrepresented and would misrepresent the source of his funds in order to induce Motors Holding to loan money and purchase stock in Sanglier Cadillac–Oldsmobile, Inc. Hence, the parties' agreement contemplated and required for its success that Sanglier violate RCW 21.20.010 of The Securities Act of Washington by directly making an untrue statement of material fact in connection with the purchase of a security. Given this illegality, they argue that general principles of contract law preclude enforcement of the parties' agreement and cite, *e.g., Hederman v. George,* 35 Wn.2d 357, 212 P.2d 841 (1949); *Williams v. Burrus,* 20 Wn. App. 494, 581 P.2d 164 (1978). They further contend that the defense of illegality may be asserted by them since the defense is not limited to those persons who may have been defrauded. While the plaintiffs may not have intended to break the law, the focus is on the legality of the conduct, not its underlying motive. Finally, the defendants argue that the other parties' knowing and active participation in the scheme to mislead General Motors and keep it uninformed renders them in pari delicto according to *Sherwood & Roberts–Yakima, Inc. v. Leach,* 67 Wn.2d 630, 409 P.2d 160, 14 A.L.R.3d 1411 (1965), but even if they are not in pari delicto, they are limited to recovering the funds advanced to Sanglier.

The plaintiffs argue in response that the partnership agreement is not illegal because, according to trial testimony, there was no prohibition against outside ownership of up to 75 percent of the stock of the dealership once Motors Holding had been bought out. The plaintiffs further argue that (1) the defendants failed to establish an intent to violate the law; (2) the nondisclosure aspect of the partnership agreement is severable from the agreement and, therefore, the alleged illegality is remote or collateral to the

illegal transaction; (3) there was no violation by the plaintiffs of RCW 21.20.010 as a result of Sanglier's misrepresentations to General Motors because Sanglier was the only person to make a misrepresentation and the plaintiffs had no intent to deceive, manipulate or defraud; (4) there was no misstatement by Sanglier because the partnership agreement made it such that the $125,000 was unencumbered and General Motors was not damaged; (5) the alleged illegality is excusable because the plaintiffs were not in pari delicto; (6) the statute of limitations on the securities act has run, RCW 21.20.430(4)(b); and (7) even if the parties are in pari delicto, public policy dictates enforcement of the agreement.

■ We agree that the trial court erred in concluding that the defendants have no standing to raise the issue of illegality and that the defense of illegality is personal to Motors Holding. A party to an illegal agreement may raise the issue of illegality and will not be estopped to assert it because nonenforcement of illegal contracts is a matter involving the common public interest. *See Sinnar v. LeRoy,* 44 Wn.2d 728, 270 P.2d 800 (1954); *Reed v. Johnson,* 27 Wash. 42, 55–56, 67 P. 381 (1901).

■ The plaintiffs' argument regarding the statute of limitations is met by the trial court's conclusion that the provisions of the securities act apply retroactively. This conclusion is not challenged on appeal and becomes the established law of this case. RAP 10.3(a)(3), (b). RCW 21.20.430(4)(b) provides that the statute of limitations for a violation of the securities act's anti–fraud provision, RCW 21.20.010, is 3 years after the date of discovery or the date when the violation would have been discovered in the exercise of reasonable care. Even assuming that the defendants' plea of illegality is not covered by the general rule that statutes of limitation apply to actions but not pure defenses to actions, *see generally Buck v. Equitable Life Assurance Soc'y of United States,* 96 Wash. 683, 689, 165 P. 878 (1917); *Buty v. Goldfinch,* 74 Wash. 532, 535–36, 133 P. 1057 (1913); 51 Am. Jur. 2d *Limitations of Actions* § 76

(1970), the statute of limitations did not run because Motors Holding did not discover Sanglier's misrepresentations until the time of the plaintiffs' suit.

As the parties impliedly recognize, the plaintiffs' recovery, though based in part on the defendants' violation of the securities act, amounts for all practical purposes to an enforcement of the parties' partnership agreement since the plaintiffs were essentially awarded the value of their respective one–third interests in the dealership/partnership as of March 31, 1978. It is for this reason that the legality of the parties' partnership agreement is an issue in this case.

■ Generally, a contract contrary to public policy or the terms and policy of a statute is illegal and unenforceable, in which case the court will leave the parties where it finds them. *State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 26, 182 P.2d 643 (1947). The same rule applies if the contract grows immediately out of and is connected with an illegal act. *Waring v. Lobdell,* 63 Wn.2d 532, 533, 387 P.2d 979 (1964) (citing *Hederman v. George,* 35 Wn.2d 357, 212 P.2d 841 (1949)); *Sherwood & Roberts–Yakima, Inc. v. Cohan,* 2 Wn. App. 703, 469 P.2d 574 (1970); 14 S. Williston, *Contracts* § 1630A, at 20 (3d ed. 1972). The test of public policy is not what the parties did or contemplated doing in order to carry out their agreement, or even the result of its performance; it is whether the contract as made has a "tendency to evil," to be against the public good, or to be injurious to the public. *Goodier v. Hamilton,* 172 Wash. 60, 62–63, 19 P.2d 392 (1933). *Accord, Makinen v. George,* 19 Wn.2d 340, 354, 142 P.2d 910 (1943). Hence, the absence of a showing at trial that Motors Holding has suffered an injury is not dispositive of the question whether the parties' agreement violated the securities act or is intimately connected with a violation of the act.

■ RCW 21.20.010 of the securities act renders it "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly: . . . (2) to make any untrue statement of a material fact . . . ."

The word "person" includes a partnership. RCW 21.20-.005(9). A "security" includes, *inter alia,* any stock or pre-organization certificate or subscription. RCW 21.20.005(12). A material fact is one which a reasonable person would attach importance to in determining his or her choice of action in the transaction. *Clausing v. DeHart,* 83 Wn.2d 70, 515 P.2d 982 (1973).

Neither Cadillac nor Motors Holding would enter into any agreement with Sanglier unless he had 25 percent of his own unencumbered funds to invest. This policy was due in part to Motors Holding's opinion that a dealer's incentive and diligence corresponds to the extent of his own stake and personal profit–making potential in the dealership. As stated in the General Motors Holding Division Investment Plan,

> [General Motors'] policy is to distribute such products through independent merchants, who operate with their own capital and for their own profit. . . . The entire history of enterprise demonstrates the futility of expecting success where any of these prime essentials is lacking to an important degree.

Sanglier was required to and did represent that his investment was his "own funds, free and clear of any present or future right, claim or interest of any kind." Under the circumstances, these were material facts. Any misrepresentation by Sanglier in applying for the dealership or as to the record or beneficial ownership of the dealership provided General Motors with a ground for terminating the dealership.

■ Sanglier misrepresented the source and status of his funds, which, by the terms of the parties' partnership agreement, stood as the consideration for Sanglier's partnership duties and could only be used to purchase the dealer's interest in the franchise. The dealer's interest, represented by stock, was required by the partnership agreement to be placed in escrow at the offices of the partnership's attorney or in a safety deposit box held by the partnership. An escrow is a trust, Restatement (Second)

of Trusts § 32, comment *d* (1959), and once an instrument is deposited in escrow, it passes beyond the depositor's control, *Lechner v. Halling,* 35 Wn.2d 903, 912, 216 P.2d 179 (1950). The funds were encumbered, *i.e.,* they were subject to the partners' charge upon them, *see* Black's Law Dictionary 908 (4th rev. ed. 1968).

As structured, the investments of Sanglier and Motors Holding were tied to a preorganization subscription and issuance of stock in proportion to the individual investment. The General Motors Holding Division Investment Plan partially describes the investment process as follows:

> The Operator makes his investment in the dealership by the purchase of $100 par Class B (non–voting) Stock. Motors Holding Division makes one–half of its investment in 6% long term notes and one–half through the purchase of $100 par Class A (voting) Stock. Shares of each class participate equally in profits on a per–share basis.

Securities were involved in Sanglier's acquisition of the dealership. RCW 21.20.005(12).

■ Unlike under the federal securities act, scienter is not required to be shown to establish a violation of RCW 21.20.010. *Kittilson v. Ford,* 93 Wn.2d 223, 608 P.2d 264 (1980). Whether intentional or not, Sanglier violated RCW 21.20.010 by making a misrepresentation of material fact in connection with the "offer, sale or purchase" of a security. The trial court erred in concluding that Sanglier's misrepresentations violated no state statute.

Participant liability for a violation of RCW 21.20.010 may result from the rendition of assistance in perpetration of the violation even though the participant is not an actual party to the sale. *See Kaas v. Privette,* 12 Wn. App. 142, 151, 529 P.2d 23, 80 A.L.R.3d 1 (1974). This rule corresponds to the rule that the person who knowingly cooperates with, lends aid to, or encourages the active wrongdoer beyond merely selling goods unconditionally with knowledge that the goods will be put to an illegal use acts in concert with him and is equally liable. *See generally*

*Doonan v. Rossi,* 112 Wash. 150, 191 P. 865 (1920); W. Prosser, *Torts,* at 292 (4th ed. 1971); 15 S. Williston, *Contracts* § 1755 (3d ed. 1972). Apart from these general principles, a partnership is liable when a partner procures property for the partnership by means of misrepresentations made in the ordinary course of the business or with the authority of the other partners. *See* RCW 25.04.130; *Iron v. Suave,* 27 Wn.2d 562, 568, 179 P.2d 327 (1947); J. Crane & A. Bromberg, *Partnership* § 54, at 310–11 (1968). By statute, this rule applies to a violation of the securities act. RCW 21.20.005(9); RCW 21.20.010. In addition, every partner who indirectly or directly controls a seller or buyer that violates RCW 21.20.010

> is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

RCW 21.20.430(3).

The plaintiffs, aware of Motors Holding's requirement regarding unencumbered funds, knew that Sanglier had misrepresented and would misrepresent the source of his funds to Motors Holding. Even with this knowledge, they provided Sanglier with the funds necessary to carry out his scheme. They thereafter agreed in their formal partnership agreement to conceal the partnership's existence, and the partnership agreement purposefully included language regarding a loan so that it would be unnecessary to file a partnership return, which, under Sanglier's dealers sales and service agreement, Sanglier would be obligated to furnish to Motors Holding should it wish to see his records. The plaintiffs, by their knowing rendition of material assistance to Sanglier and their agreement to conceal their participation, acted in concert with Sanglier. Were liability at issue, we are of the opinion that the plaintiffs and Carras would be personally liable with Sanglier in the absence of an enforceable partnership agreement. *See* 15 S. Williston,

§ 1755, *supra*. Given the plaintiffs' concession of the existence of the partnership, the partners would be equally as civilly liable as Sanglier, and the partnership would be liable because Sanglier was acting on behalf of the partnership when he acquired the dealership. RCW 25.04.130; RCW 25.04.150; RCW 21.20.430(3); *Iron v. Suave, supra.*

■ The partnership agreement is structured and worded to conceal the parties' relationship so as to prevent Motors Holding from ascertaining those facts necessary to the discovery of Sanglier's misrepresentations. The success of the parties' venture depended in part on the parties' successful concealment. Although the partnership agreement may not literally violate RCW 21.20.010(2), it had the effect of aiding and promoting the violation thereof and it is contrary to the spirit and policy of the act to deter less than full disclosure of material facts. The partnership agreement specifically runs afoul of RCW 21.20.010(3), which renders it

> unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
>
> . . .
>
> (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Having the effect of deceiving Motors Holding and being contrary to RCW 21.20.010(3) and the public policy underlying RCW 21.20.010(2), the partnership agreement is illegal and will not be enforced by the courts. *See generally State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 182 P.2d 643 (1947); *Goodier v. Hamilton,* 172 Wash. 60, 19 P.2d 392 (1933); 6A A. Corbin, *Contracts* § 1455 (1962); Restatement of Contracts § 577, comment, Illustration 4, § 580 (1932).

■ The next question we must decide is whether the parties' agreement falls within one of the exceptions to the doctrine of illegality. As stated in *Sherwood & Roberts–Yakima, Inc. v. Cohan,* 2 Wn. App. 703, 710, 469 P.2d 574 (1970),

>Though variously stated, the authorities are in general agreement that if the promise sued upon is related to an illegal transaction, *but is not illegal in and of itself,* recovery should not be denied, notwithstanding the related illegal transaction, if the aid of the illegal transaction is not relied upon or required, or if the promise sued upon is remote from or collateral to the illegal transaction, or is supported by independent consideration. Considered together, these various tests form what may be termed the "doctrine of severability."

(Footnotes omitted. Italics ours.) We deem the parties' partnership agreement to be the promise sued upon since to uphold the plaintiffs' right of recovery would effectually enforce the partnership agreement. It is not subject to the test of severability because it is illegal.

Even assuming that the partnership agreement is not illegal, the first question to be asked in connection with the test of remoteness is whether the partnership agreement may be considered separate and distinct from the antecedent misrepresentations by Sanglier. *See Sherwood & Roberts–Yakima, Inc. v. Cohan, supra* at 713. Even prior to the parties' written partnership agreement, the parties were partners according to the trial court's undisputed findings. The success of the parties' venture, though having as its ultimate aim the apparently legal object of obtaining the dealership as a partnership asset, immediately grew out of, was intimately connected with, and was dependent upon the success of Sanglier's misrepresentations and the parties' secrecy. The partnership agreement is not separate and distinct. *See Sherwood & Roberts–Yakima, Inc. v. Leach,* 67 Wn.2d 630, 409 P.2d 160, 14 A.L.R.3d 1411 (1965); *Hederman v. George,* 35 Wn.2d 357, 212 P.2d 841 (1949).

Even if the partnership agreement were to be considered separate and distinct and only casually related to the transaction involving the active misrepresentations, it must still be supported by independent consideration. *Sherwood & Roberts–Yakima, Inc. v. Cohan, supra* at 714. The plaintiffs' promises to invest and actual investments were the engine of Sanglier's misrepresentations and constituted the

plaintiffs' consideration for the partnership agreement and Sanglier's obligations thereunder. The written partnership agreement, though formally executed after the misrepresentations, states that the plaintiffs have presently furnished Sanglier with funds so that he "may purchase the dealer's interest in Sanglier Cadillac–Oldsmobile, Inc., under a Motors Holding Division Plan." The partnership agreement does not meet the independent consideration test. *See Sherwood & Roberts–Yakima, Inc. v. Leach, supra.*

A line of cases holds that an independent and subsequent agreement for the distribution of the profits of an illegal transaction will be enforced if made after the illegal contract or transaction has been fully executed. *Melton v. United Retail Merchants of Spokane,* 24 Wn.2d 145, 163 P.2d 619 (1945); *Central Labor Council v. Young,* 136 Wash. 550, 240 P. 919 (1925); *McDonald v. Lund,* 13 Wash. 412, 43 P. 348 (1896). The plaintiffs do not qualify for relief under these cases because their right of recovery rested upon their establishment of the parties' partnership, which included and depended upon a showing of their rendition of aid to Sanglier as part of the agreement and the plaintiffs' consideration. *See Melton v. United Retail Merchants of Spokane, supra* at 161–62. In addition, the fact that the plaintiffs' suit is based on the partnership agreement belies any suggestion that the agreement has been fully executed. *See Brower v. Johnson,* 56 Wn.2d 321, 325, 352 P.2d 814 (1960).

In response to the plaintiffs' argument that the illegality is excusable because they were not in pari delicto, we note that even if the plaintiffs were not in pari delicto, they would be limited to disaffirming their agreement and recovering the funds they paid under it. *See Duddy–Robinson Co. v. Taylor,* 137 Wash. 304, 307–10, 242 P. 21 (1926); 15 S. Williston, *Contracts* § 1789 (3d ed. 1972); Restatement of Contracts § 604 (1932). They have recovered their funds.

While it is true that Sanglier had the benefit of the plaintiffs' funds, it is equally true that he purchased the majority of the dealership stock solely with the fruits of his own labor. The dealership prospered largely as a result of Sanglier's efforts. The plaintiffs have recovered their investments. To award the plaintiffs more than this by means of public policy, *see generally Duddy–Robinson Co. v. Taylor, supra,* would sanction the plaintiffs' concerted actions with Sanglier and Carras to acquire the dealership by means of an actively concealed misrepresentation of material fact violative of the terms and policy of the securities act. The defense of illegality defeats the plaintiffs' damage claim.

The judgment below is reversed with the direction that the plaintiffs' complaint be dismissed with prejudice.

JAMES, A.C.J., and ANDERSEN, J., concur.

Reconsideration denied October 29, 1980.

Review granted by Supreme Court January 29, 1981.