## WILLIAM HUGHES *v.* WILLIAM DONALD SCHAEFER ET AL.

[No. 21, September Term, 1982.]

*Decided November 23, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*William Hughes,* in proper person, appellant.

*Benjamin L. Brown, City Solicitor,* with whom were *Otho M. Thompson, Associate City Solicitor, William R. Phelan, Jr., Assistant City Solicitor, Henry R. Lord, Donald P. McPherson, III, Cynthia J. Morris* and *Piper & Marbury* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

Mayor and City Council of Baltimore (City), a municipal corporation and one of the appellees, makes loans, including the guaranteeing of loans made by others, for the development and redevelopment of property within the municipality. The loan program is administered by the City's Board of Estimates [1] which is assisted by two individuals, known as the "Trustees," both of whom act pursuant to four trust agreements with the City. Appellant, William Hughes (Plaintiff), by this taxpayer's suit challenged the validity of the trust agreements and the role of the Trustees in the program.[2] The Circuit Court of Baltimore City declared the trust agreements to be valid in their entirety and denied injunctive relief. This Court granted certiorari prior to consideration of Plaintiff's appeal by the Court of Special Appeals. For the reasons hereinafter stated, we find to be invalid that aspect of the trust agreements which purportedly restricts approval by the Board of Estimates to transactions recommended by the Trustees. In all other respects, we shall affirm the judgment below.

---

**1.** The Board of Estimates is composed of the Mayor, the President of the City Council, the Comptroller, the City Solicitor and the Director of Public Works. Baltimore City Charter (1964, 1981 Repl. Vol.), Art. VI, § 1. For a description of the powers of the Board, *see* City of Balto. v. Am. Fed. of St., Co. and Mun. Employees, 281 Md. 463, 470-71, 379 A.2d 1031, 1034-35 (1977).

**2.** Plaintiff's suit named parties additional to the City as defendants below. The issues presented do not require any distinction to be made between appellees, so that we shall refer only to the City.

Plaintiff does not question the underlying authority of the City to conduct a loan and loan guarantee program for property development and redevelopment purposes. Nor does Plaintiff claim that, within the structure of the City government, the exercise of the authority to make or guarantee loans has been placed in any City officer or body, other than the Board of Estimates, by any constitutional or charter provision or by any legislative enactment. Rather, the attack is focused on the Board's use both of trust agreements and of the Trustees in the operation of the program. Some background is required for an understanding of the specific issues which have been raised.

Each trust agreement was made between the City, the Commissioners of Finance of Baltimore City and Lawrence B. Daley and Charles L. Benton, Jr. The latter two parties are denominated "Trustees." The Commissioners of Finance are now the Board of Finance. See Charter, Art. VII, § 16.[3] Mr. Benton is Director of Finance of the City. Mr. Daley was Deputy City Treasurer. When Mr. Daley resigned from his City office and as a Trustee, he was replaced as a Trustee, effective December 17, 1980, by Frank Baker, Jr. Mr. Baker, who holds no City office, has had extensive experience in corporate and financial affairs in private business. The two earliest trust agreements are each dated December 22, 1976. Both deal with the proceeds of general obligation bonds issued by the City for residential, commercial or industrial property rehabilitation and development purposes. Agreement No. 1 relates to loan proceeds used by the City in connection with its guarantees of loans made by third parties to borrowers who are to use the loan funds for the designated purposes, while Agreement No. 2 relates to bond proceeds used by the City to make direct loans for the designated purposes.[4] Trust Agreement No. 3, dated January 26,

---

3. The Board of Finance is composed of the Mayor, the Comptroller and three persons appointed by the Mayor. The Board issues and sells certificates of indebtedness of the City and determines "all matters pertaining to the issuance and sale of said certificates of indebtedness." Charter, Art. VII, § 16(b).

4. The City predicates its authority to engage in the transactions contemplated by Trust Agreements Nos. 1 and 2 on Md. Const., Art. XI-G (City of

1977, deals with funds that the City receives from time to time in the form of grants and gifts from public, private and eleemosynary sources and that may be used for loans or guarantees for construction or rehabilitation of industrial, commercial and residential properties within the City. Funds under this agreement are primarily federal grants.[5] Trust Agreement No. 4 of July 13, 1977 deals with funds that are "derived from a variety of sources" and that "are appropriated in the Capital portion of the annual Ordinances of Estimates and/or allocated by the Board of Estimates of Baltimore City for particular and general purposes . . . ." Trust Agreement No. 4 then recites:

> [T]he accomplishment of some of these purposes requires that interest and other earnings on the sums appropriated be accrued to the benefit of the particular purposes; and
>
> . . . the duration of some of these purposes extends over a period of time exceeding one year in duration; and
>
> . . . it is the desire of the City to create an orderly system for supervision of the said funds to be used for the purposes described heretobefore . . . .

Funds involved under Trust Agreement No. 4 are, by its terms, appropriated funds.[6] Under Charter requirements and the budgetary practices of the City, the funds involved in the other three trust agreements are also appropriated funds.

---

Baltimore — Residential Rehabilitation and Commercial Financing Loans), Art. XI-H (City of Baltimore — Residential Financing Loans), Art. XI-I (City of Baltimore — Industrial Financing Loans) and on Acts of the General Assembly of Maryland initially authorizing particular City bond issues for the purposes stated in these constitutional amendments.

5. The City predicates its authority to use grant funds for the loan and guarantee program on Charter, Art. I, § 3 and Art. II, §§ 3, 15 and 15A.

6. The City predicates on Charter, Art. VI, § 2 (i) and on Md. Code (1974), §§ 15-106 and 15-102 (o) of the Estates and Trusts Article its authority to administer under Trust Agreement No. 4 the appropriated funds, and the proceeds from the investment of the appropriated funds, on behalf of the applicable projects for which they were appropriated.

Each trust agreement provides that the Trustees shall, from time to time, make recommendations to the Board of Estimates as to the use of the funds involved under the agreement for the particular purposes described in the trust agreement.

A stipulation of facts between the parties fleshes out the procedure.

To enter into a loan or guaranty or other transaction under the Trust Agreements, the Trustees review the proposed transaction, determine its financial feasibility, advise the Board of Estimates from time to time of the status and terms of the proposed transaction, present the proposed transaction for preliminary or final approval as necessary or appropriate, complete the transaction in the final form approved by the Board of Estimates and carry out the transaction on behalf of the Board of Estimates.

With respect to loan transactions, the Trustees request the prospective borrower to submit information regarding the project in much the same manner as would a banking officer when seeking to determine the feasibility of financing a project. Similarly, with respect to guarantees, the Trustees' review of the project assesses its financial risk.

All transactions which have been entered into under the trust agreements have been reviewed and approved by the Board of Estimates. Without that approval the transactions do not proceed.

Through the fiscal year ending June 30, 1980 the special fund accounts under the trust agreements were included in the annual reports of the City Department of Finance. Thereafter, quarterly financial statements of the Trustees have been submitted both to the Board of Estimates and to a review committee of the City Council. An annual report of operations is also provided by the Trustees and is subject to review both by the City auditor and by a firm of independent public accountants.

Each of the trust agreements contains a provision (the restricting clause) of which the following, from Trust Agreement No. 1, is typical:

> The Board of Estimates of the City shall not approve any contracts of guarantee or insurance of financial loans, except upon the favorable recommendations of the Trustees.[7]

In some instances the Board of Estimates has approved transactions, or requested review and revision of transactions, which initially received unfavorable recommendations from the Trustees.[8]

Against the foregoing background, Plaintiff advances three contentions:

1. The Trustees could only have been created by an ordinance and not by contract with the Board;

2. The trust agreements constitute an unlawful delegation by the Board of its discretionary power to the Trustees; and

3. The trust agreements, and the role of the Trustees thereunder, violate Charter provisions dealing with advertising and competitive bidding.

---

7. Trust Agreement No. 2 in part provides:

> The Board of Estimates of the City shall not approve any contracts in connection with direct loans as aforesaid, except upon the favorable recommendations of the Trustees.

Trust Agreement No. 3 (grants and gifts) in part provides:

> The Board of Estimates of the City shall not approve any contracts of loans, grants, guarantees or insurance, except upon the favorable recommendation of the Trustees.

Trust Agreement No. 4 (appropriated capital funds) in part provides:

> The Board of Estimates of the City shall not approve any contracts or agreements involving accruals of interest or other earnings on funds appropriated or allotted for specific or general Capital purposes except upon the favorable recommendations of the Trustees.

8. At oral argument we were advised by the City Solicitor that the Board of Estimates has approved at least one loan which the Trustees had not recommended, either initially or after re-review.

(i)

The answer to Plaintiff's first contention is found in the Charter. On the record before us, the Board exercises the discretion to approve a loan or guarantee, and the Trustees assist the Board by analyzing and negotiating the terms of a proposal and by making a recommendation to the Board. Art. VI, § 4 (c) of the Charter provides that "[a]ll professional services contracted for by the City shall be engaged in the manner prescribed by resolution of the Board of Estimates." Each of the trust agreements has been approved by resolution of the Board of Estimates and each provides for a form of professional service. The trust agreements are the means by which the Board of Estimates has obtained the benefit of financial expertise to assist it in making complex business decisions.[9]

The position of the Plaintiff seems to be that once the Board of Estimates concluded that there should be a review by others of loan proposals, preliminary to Board consideration, the Board could not implement that decision by contract; rather, an ordinance was required. Plaintiff perceives support for this position in Charter, Art. II (General Powers), § 15A (Industrial and Economic Development). In general, that section deals with the acquisition and disposition of property by the City in connection with its industrial and economic growth. In either instance certain determinations must first be made by the Board of Estimates "in its sole and absolute discretion." § 15A (c). Subsection (e) then provides for the power in the City

> [t]o vest jurisdiction or authority to exercise or perform all or any of the aforegoing powers, except those specifically reserved to or to be exercised by the Board of Estimates, in any suitable board, commission, department, bureau or other agency of the [City] now in being or in any new board, commis-

---

9. Mr. Benton receives no compensation, in addition to his municipal salary, for acting as a Trustee. Nor did Mr. Daley. Mr. Baker serves without compensation.

sion, department, bureau or agency of the [City], which it is hereby empowered to create and establish for such purposes.

Subsection (e) is an authorization and not a limitation. The enumeration of the powers particularized in Art. II is introduced by the following statement:

The [City] shall have full power and authority to exercise all of the powers heretofore or hereafter granted to it by the Constitution of Maryland or by any Public General or Public Local Laws . . . *and in particular, without limitation upon the foregoing, shall have power* by ordinance, *or such other method as may be provided for in its Charter,* subject to the provisions of said Constitution and Public General Laws [to exercise the enumerated powers]. [Emphasis supplied.]

It is not disputed in this case that the authority of the City to conduct a loan and guarantee program is, under current law, exercisable by the Board. In order to obtain assistance in carrying out that function, the Board may use its Charter conferred power to contract for professional services to be rendered to the City without an ordinance having created the Trustees as a City agency for the purpose of furnishing staff support to the Board.[10]

(ii)

Nor do we see any unlawful delegation to the Trustees of the Board's governmental or discretionary power. Under the trust agreements there is no power in the Trustees to approve a loan or guarantee. That power remains in the Board of Estimates. In this respect the case at hand is like *Portsmouth Stove and Range Co. v. Baltimore,* 156 Md. 244,

---

**10.** By addressing Plaintiff's argument, we do not imply that Art. II, § 15A of the Charter controls, in whole or in part, the power of the City to engage in the loan and guarantee program.

144 A.' 357 (1929). There an ordinance provided that before various types of gas appliances could be sold in the City, a sample of the appliance had to be approved by the Commissioner of Health, after it had been tested for compliance with safety standards. The Commissioner, as expressly authorized by the ordinance, required the testing to be done by the American Gas Association, a private organization. This Court held there was no unlawful delegation inasmuch as the association decided nothing. It merely furnished information to the Commissioner who retained the power to approve.

However, each of the trust agreements contains a restricting clause which, on its face, limits the Board's exercise of the City's power to make a loan or guarantee to proposals recommended by the Trustees. Literally, the Board has bound itself in advance not to approve an unrecommended proposal. Under the trust agreements, the Trustees are seemingly given a prior veto over the City's power to make loans or guarantees which the Board, in its discretion, might otherwise decide should be made. This the City may not do.

*Mugford v. City of Baltimore,* 185 Md. 266, 44 A.2d 745 (1945) discusses the applicable principle. When the Department of Public Works of Baltimore City entered into a collective bargaining agreement with a union representing certain City employees, a taxpayer obtained a judgment declaring the agreement to be invalid and enjoining performance by the City of its terms. The taxpayer appealed from that portion of the decree which excluded from the injunction deduction of union dues by the City from the pay of those employees who consented to the checkoff. There was no cross-appeal by the City. This Court, nevertheless, said:

> Moreover, it was admitted by the [City], in argument, that the Department of Public Works could not bind the City, by contract, in any particular relative to hours, wages or working conditions, either as to union employees, or as to all employees

in the same classification. To the extent that these matters are covered by the provisions of the City Charter, creating a budgetary system and a civil service, those provisions of law are controlling. To the extent that they are left to the discretion of any City department or agency, the City authorities cannot delegate or abdicate their continuing discretion. Any exercise of such discretion by the establishment of hours, wages or working conditions is at all times subject to change or revocation in the exercise of the same discretion. [*Id.* at 270, 44 A.2d at 746-47.]

*See also* 43 Am. Jur., *Public Officers,* § 295 quoted in *Rockville v. Brookeville,* 246 Md. 117, 148, 228 A.2d 263, 281 (1967) (dissenting opinion).

However, the invalidity of the restricting clauses does not void the trust agreements in their entirety. It is clear that the parties to the trust agreements can carry out the other provisions of the agreements even if the restricting clauses are unenforceable. Indeed, applicants for loans and guarantees have presented their proposals to the Board of Estimates after the applicants have failed to obtain a favorable recommendation from the Trustees. The restricting clauses seem to have been included in the trust agreements in order to give the Board some insulation from loan applicants, but that purpose is incidental when the agreements are viewed as a whole. Under these circumstances the restricting clause in a given trust agreement, while contrary to public policy, contains "nothing contrary to good morals, and nothing for which a legal penalty is incurred, and therefore it does not taint the whole agreement so as to render it void *in toto.*" *Nicholson v. Ellis,* 110 Md. 322, 332, 73 A. 17, 19 (1909) (mortgage securing purchase price in sale of a business is not invalidated by seller's covenant not to compete, even if the covenant is illegal). *See also Baldwin v. Grymes,* 232 Md. 470, 194 A.2d 285 (1963) (illegal provision in nursing home contract will not affect the validity of contract, when the provision was not so interwoven into the terms of the

contract so as to be inseverable from it); *Hebb v. Stump, Harvey & Cook,* 25 Md. App. 478, 334 A.2d 563 (1975) (overbroad restrictions are severable from otherwise valid noncompetition agreement); *Connolley v. Harrison,* 23 Md. App. 485, 327 A.2d 787 (1974) (invalid restraint on alienation can be severed from contract without destroying validity, provided that restraint is not so interwoven as to be logically inseparable from rest); 6A *Corbin on Contracts,* § 1520 (1964).

Because the restricting clauses of the trust agreements facially would prevent the continuing exercise by the Board of its ultimate judgment and discretion, we hold the restricting clauses to be invalid.

### (iii)

Plaintiff also asserts that an agreement between the City and a borrower under the loan and guarantee program is a contract for a "public work" within the meaning of Art. VI, § 4 of the Charter, so that advertisements for proposals must first be published (§ 4(b)) and the award made to the lowest responsible bidder (§ 4(g)).[11] In the stipulation which was filed in the trial court, it is stated that the City contends "that in no instance was advertising and competitive bidding required before approval of transactions under the Trust Agreements . . . ."

---

11. Charter, Art. VI, § 4 (b) in part provides:

In contracting for any public work, or the purchase of any supplies, materials, and equipment . . . involving an expenditure of five thousand dollars or more, for the City or by any municipal agency, advertisements for proposals for the same shall first be published . . . .

Subsection (g) of the same Charter section in part provides:

All bids made to the City in response to the formal advertising procedures contained in this Section, for materials, supplies, equipment, services or work for any purpose whatever, unless otherwise provided in the Charter, shall be opened by the Board of Estimates. The Board of Estimates, after opening said bids, shall award the contract as an entirety to the the [sic] lowest responsible bidder, or by items to the respective lowest responsible bidders, or shall reject all bids . . . .

Plaintiff relies on *Grinnell Co. v. City of Crisfield,* 264 Md. 552, 287 A.2d 486 (1972). *Grinnell* involved the attempt by a subcontractor to impose a mechanic's lien on land and buildings owned by Crisfield. That municipality had purchased land and had entered into a construction contract with a prime contractor for enlarging a manufacturing plant, all pursuant to a purchase and leaseback with the Rubberset Company. Funds for the acquisition and construction had been raised by the sale of industrial revenue bonds. It was held that the mechanic's lien remedy did not apply because the construction project fell within the "Little Miller" Act, then Md. Code (1957, 1969 Repl. Vol.), Art. 90, § 11. Financing land acquisition and construction under the authority of the industrial revenue bond statute "served a valid purpose, and consequently [was] a 'public work or improvement,' as those words [were] intended in Article 90, § 11." *Id.* at 559, 287 A.2d at 489. *Grinnell* did not involve a competitive bidding statute and is not on point.[12]

In the instant matter, one type of transaction in which the City lends money for construction or redevelopment occurs where the realty either is owned by the borrower or is to be

---

12. Decisions in other states, that have addressed claims that certain aspects of municipal transactions, financed by industrial development revenue bonds, violated competitive bidding statutes, have held that the bidding requirements did not apply. *See* Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5 (1964); Gregory v. City of Lewisport, 369 S.W.2d 133 (Ky. 1963); Bennett v. City of Mayfield, 323 S.W.2d 573 (Ky. 1959); R.E. Short Co. v. City of Minneapolis, 269 N.W.2d 331 (Minn. 1978) ("tax-increment" financing of general obligation bonds); Wring v. City of Jefferson, 413 S.W.2d 292 (Mo. 1967); Clem v. City of Yankton, 83 S.D. 386, 160 N.W.2d 125 (1968); Uhls v. State ex rel. City of Cheyenne, 429 P.2d 74 (Wyo. 1967). Justice (later Chief Justice) Rabinowitz of the Supreme Court of Alaska, concurring in Libby v. City of Dillingham, 612 P.2d 33, 46 (1980) has presented the following rationale for the result of these cases:

> In most cases municipalities must negotiate agreements for establishing a new industry in a community on an individual basis with a prospective industry; it is simply unrealistic to require a municipality to issue a general invitation to bid as a means of attracting such potential industrial developers. For that reason, agreements between municipalities and industries for new development, which may include construction of plants financed by municipal bonds, property leasing or sale arrangements, and tax benefits tailored to the specific needs of the industrial developer, have been widely exempted from general competitive bidding requirements.

acquired by the borrower, other than from the City, as part of the entire transaction. In such loans the Charter's competitive bidding requirements have no application. Because the proposed project relates to a specific location, owned or to be owned by the borrower, there is no competitor for a project at the site. Such transactions fall within the principle applied in *Hylton v. City of Baltimore,* 268 Md. 266, 300 A.2d 656 (1972). There we held that Art. VI, § 4 did not apply to a contract to construct for the City a resource recovery solid waste disposal plant utilizing a pyroloysis process. The need to dispose of a large quantity of solid waste, to have recoverable resources of a kind that would be saleable in the Baltimore area, to comply with anti-pollution laws and to obtain funding assistance through an Environmental Protection Agency demonstration grant narrowed the competitors capable of fulfilling the City's objectives to but one contractor. City financing of construction to be let by the borrower, and not by the City, on the borrower's own land and for the borrower's own use is not a "public work" under Art. VI, § 4. It would "constitute a futile act, in the name of a policy which would not be served, to require competitive bidding" where the particular property is held by the borrower, other than as a transferee from the City. *Id.* at 279, 300 A.2d at 662.

It further appears that transactions involving the Trustees, when viewed in their entirety, may be more complex than simply loans or guarantees by the City. The parties have stipulated that "[i]n some instances, the projects would be those for which the Department [of Housing and Community Development] had requested invitations for proposals for exclusive negotiating rights with the City followed by a disposition agreement entered into between the City, acting through the Board of Estimates, and the developer." The facts of any such transaction are not in the record. In the trial court the City made plain its position that there were no transactions engaged in under the trust agreements which were governed by competitive bidding. It was therefore the Plaintiff's burden to place in evidence facts demonstrating that one or more aspects of one

or more transactions did indeed fall within the meaning of "public work," as used in Art. VI, § 4. The Plaintiff did not even attempt to meet that burden. This Court cannot render decisions in a factual vacuum. Accordingly, we shall affirm the judgment of the trial court on the Plaintiff's third issue.

> *Judgment of the Circuit Court of Baltimore City affirmed in part and reversed in part.*
>
> *Case remanded to that Court for the entry of a declaratory judgment consistent with this opinion.*
>
> *Costs to be paid two-thirds by William Hughes and one-third by Mayor and City Council of Baltimore.*