Gordon J. ZERBETZ, Appellant,

v.

ALASKA ENERGY CENTER and State of Alaska, Appellees.

No. 7873.

Supreme Court of Alaska.

May 10, 1985.

B. Richard Edwards, Dave R. Christianson, Law Offices of B. Richard Edwards, Anchorage, for appellant.

Thomas M. Jahnke, Asst. Atty. Gen., Norman C. Gorsuch, Atty. Gen., Juneau, for appellees.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

When the Legislature created the Alaska Energy Center (Center), it mandated six general goals and appropriated six million dollars.[1] The Center's newly constituted board of directors (Board) immediately began to search for an executive director. Ten months and two hundred applicants later, the Board decided to employ Gordon Zerbetz, who was then beginning another six-year term as chairman of the Alaska

Public Utilities Commission (APUC). On March 13, 1981, Board chairman John Pursley and Zerbetz signed the contract at issue in this case. It purported to define Zerbetz's responsibilities and powers, provide for his compensation, and establish his authority vis-a-vis the Board. Zerbetz was to hire staff, establish a personnel system, open offices, act as agent, make agreements, and prepare reports, while the Board was to retain the right to terminate Zerbetz's contract on thirty days' notice. The contract was for three years, and Zerbetz was to be paid $89,500 per year. The contract's most interesting provision was Section 9, parts of which read as follows:

9. *Termination.* (a) This agreement shall be considered terminated by the Board or the State upon the happening of any of the following events:

(i) Amendment of AS 46.12 or action by the Board or the State reducing the authority or increasing the responsibilities of the Executive Director under AS 46.12 or set forth in this Agreement;

(ii) Reducing the budget of the Center for any fiscal year to a level below $3,000,000;

(iii) Reducing the level of employees of the Center without the consent of Zerbetz;

(iv) Failure of the Board to approve to the extent necessary the hiring, termination, classification or numbers of employees of the Center deemed appropriate by Zerbetz;

(v) Giving Zerbetz thirty (30) days notice of termination of this Agreement, notwithstanding that such notice may be given for cause; and

---

1. To quote AS 46.12.020:

The primary purpose of the center is to create employment opportunities and other benefits in the state through the development and use of more efficient technologies. The center shall

(1) promote the most efficient and appropriate technologies for the use and conservation of the state's energy resources;

(2) provide economic benefits to state citizens;

(3) promote the effective use of the state's resources;

(4) promote diversification of employment opportunities;

(5) reduce state energy imports; and

(6) bring existing and new technologies to a stage of commercial feasibility.

A six million dollar appropriation to the Center was made through ch. 120, § 52, SLA 1980, pp. 66–67.

(vi) Reducing retirement system benefits, vacation time or other benefits afforded under this Agreement.

(b) Except for paragraph 9(a)(v), Zerbetz may waive any termination occurring under paragraph 9(a).

. . . .

(c) In the event of a termination under subparagraph (a) of this paragraph 9 of this Agreement and such termination is not waived by Zerbetz under subparagraph (b) of this paragraph 9 of this Agreement, the Board shall cause the Alaska Energy Center or the State to:

(i) Pay to Zerbetz within thirty (30) days of the termination, the amount of compensation Zerbetz would have received had this Agreement terminated by expiration of its term established by paragraph 3 of this Agreement; and

(ii) Pay any and all contributions, except employee contributions, to any retirement, disability, or death benefit plan or system, in advance, to total the amount that would have been paid to the system for the benefit of Zerbetz if this Agreement terminated at the end of the term set forth in paragraph 3 of this Agreement.

. . . .

In short, the contract forbade the Board to trespass on Zerbetz' contractually defined territory. If it did, he could declare the contract terminated, receive the balance of his three-year salary, and seek employment elsewhere. Although the Board retained the right to dismiss Zerbetz on thirty days' notice, the contract gave him the right to the rest of his salary if it dismissed him. We assume for the purposes of this appeal from the grant of summary judgment in favor of the board, that the Board entered into this contract believing the contract necessary to attract an executive director of Zerbetz' caliber.

The contract did give Zerbetz considerable leverage against the Board. If, in the first few months of the Center's existence, he and the Board had disagreed with one another, he could have pointed to an action "reducing the authority or increasing the

responsibilities of the Executive Director," declared the contract terminated, and forced the Board to pay him close to $300,-000 in future salary and benefits. Zerbetz' economic weapons did not prevent the Legislature from effectively defunding the Center. During its 1981 session, the Legislature reduced the Center's operating budget from $6,000,000 to $560,000 and designated the remaining $5,440,000 as a capital expenditure. Sec. 15, ch. 16, SLA 1981. The 1980 appropriation expired by its own terms at the end of June. The 1981 budget did not include an appropriation for the Center; instead, what remained of its 1980 capital appropriation was transferred to the Department of Commerce and Economic Development "to be used only to complete projects and to pay overhead expenses." Ch. 82, § 20, SLA 1981.

What Zerbetz did while all this was happening is not clear. He claims to have received a notice of termination, and for purposes of this appeal we assume that he was terminated pursuant to paragraph 9(a)(v) of his contract. When he demanded payment of the balance due under the contract, the State refused to pay him, asserting that the contract was legally invalid. The superior court agreed with the State, granting it summary judgment on the grounds that the contract was "illegal, void as against public policy, unsupported by an appropriation of law, and an ultra vires undertaking by the Alaska Energy Center board members."

Four issues are before us. First, we must decide whether the Board's decision to give Zerbetz a three-year contract goes beyond or is inconsistent with its power to "employ and determine the salary of an executive director." AS 46.12.100. Second, we must assess the effect of AS 46.-12.100's third sentence, which places the executive director and all employees of the Board in the "exempt service," as defined by AS 39.25. Third, we must decide if the fact that the Legislature's appropriations to the Center have lapsed means that Zerbetz cannot recover on the contract. Finally, we must answer two related and com-

plex questions: is the contract void as against public policy, in whole or in part; and if it is void only in part, do the part or parts that are void vitiate any obligation created by the parts that are not void.

## I. IS THE POWER TO EMPLOY AN EXECUTIVE DIRECTOR THE POWER TO GIVE THE EXECUTIVE DIRECTOR TENURE FOR A TERM OF YEARS?

■ At issue are a common-law rule we think outmoded and a term, "employ", which we have never defined in this context. The common-law rule, according to the State, is that all state employees serve at the pleasure of their superiors, and that although the Legislature may vary this pattern it must do so explicitly if its action is to be effective. When it created the Alaska Energy Center, the State argues, the Legislature did not override the common-law rule; instead, it gave the Center the power to "employ" an executive director, and the power to "employ" is not the power to give an employee tenure. We find the State's restrictive reading of the statute and the legal rules providing a context for the statute unpersuasive, and hold that the power to "employ and determine the salary of an executive director" is, barring contrary limitations elsewhere in the statute, the power to enter into an employment contract giving an executive director job security.

■ Two quite different views of public employment have been presented to us. The State contends that the public interest requires people like Zerbetz to be terminable at will. It cites *Scott v. Philadelphia Parking Authority*, 402 Pa. 151, 166 A.2d 278, 280–81 (1960) which quotes from an earlier Pennsylvania case:

"[G]ood administration requires that the personnel in charge of implementing the policies of an agency be responsible to, and responsive to those charged with the

policy-making function, who in turn are responsible to a higher governmental authority, or to the public itself, whichever selected them. This chain of responsibility is the basic check on government possessed by the public at large." The power to dismiss summarily is the assurance of such responsibility.[2]

Zerbetz argues that private employers offer job security in order to attract good employees, and there is no reason why government agencies should not be able to do the same. He cites a Florida case:

[T]he best way to get the best people to do their best job is to treat them right, pay them well and offer them security in their employment.

*Tweed v. City of Cape Canaveral*, 373 So.2d 408, 410 (Fla.App.1979), *cert. denied*, 385 So.2d 755 (Fla.1980). We think that the power to employ includes the power to offer an employee job security, and that it is not necessary to make employees in the public sector employees at will in order to make them accountable to the public.

To the extent that the common law supports the state's position, we believe that recent decisions by this court, and the United States Supreme Court, have displaced the common law and recognized that public employees are not necessarily terminable at will. In *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976), the Supreme Court observed that "[a] property interest in employment can, of course, be created by ordinance, or by an implied contract." Detailed examination of personnel rules, statutes, and "mutually explicit understandings" is necessary if one is to determine if an employee has a protected interest in his job. *Id.* at 344 & n. 6, 96 S.Ct. at 2077 & n. 6, 48 L.Ed.2d 684 at 690.[3] We applied a similar analysis in *Breeden v. City of Nome*, 628 P.2d 924 (Alaska 1981), holding that the Nome City manager's written contract, guaranteeing

---

**2.** *Quoting Mitchell v. Chester Housing Authority,* 132 A.2d 873, 880 (Pa.1957).

**3.** *See also Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548,

561 (1972) ("[R]ules or understandings ... secure certain benefits and ... support claims of entitlement to those benefits").

him thirty days' notice of termination, gave him a " 'legitimate expectation' of continued employment." *Id.* at 926, *citing Bishop, supra* 426 U.S. at 344, 96 S.Ct. at 2077, 48 L.Ed.2d at 690. In our view, the inquiries *Bishop* and *Breeden* require are fundamentally inconsistent with the common-law rule on which the State relies.

 *Bishop* and *Breeden* are inconsistent with the common law rule because they recognize that public employees have rights. At the very least, public employees have the right not to be dismissed for certain improper reasons. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (dismissal for exercising First Amendment rights); *State v. Haley,* 687 P.2d 305, (Alaska 1984) (same); *cf. Mitford v. de Lasala,* 666 P.2d 1000 (Alaska 1983) (implied convenant of good faith and fair dealing in private at-will employment contract). If rules or understandings give them a "legitimate expectation of continued employment," they may not be deprived of this interest without notice and an opportunity to be heard. *Breeden,* 628 P.2d at 926, *citing Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Understandings and informal rules may, in fact, amount to a system of de facto tenure. *Perry v. Sindermann,* 408 U.S. 593, 600–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570, 579–80 (1972). With this as background, we hold that a public employer may enter into formal contracts providing for job security with its employees absent explicit legislative authorization.

 On the other hand, it is clear that the Legislature may create governmental positions whose occupants are intended to serve "at the pleasure" of their superiors.

*See Breeden,* 628 P.2d at 926, *citing Bishop,* 426 U.S. at 345 n. 8, 96 S.Ct. 2078 n. 8, 48 L.Ed.2d at 690 n. 8. The State contends that by using the word "employ" in the statute empowering the Center to "employ and determine the salary of an executive director," the Legislature intended to make Zerbetz an employee at will. It argues that "employ" and "appoint" are equivalent terms, and that this Court has recently held that "appointment" is merely the act of designating a public officer; a statute giving an agency the power to "employ" an executive director, then, does not give the agency the power to grant the executive director tenure. In support of its argument, the State cites *Begich v. Jefferson,* 441 P.2d 27, 32 (Alaska 1968) which held that the word "appointed", as used in article II, section 5 of the Alaska Constitution,[4] "is sufficiently broad in meaning to encompass the hiring of employees ...," and *Division of Elections v. Johnstone,* 669 P.2d 537, 539 (Alaska 1983), *cert. denied, Denardo v. Johnstone,* — U.S. —, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984), which held that the "appointment" of a judge takes place when the Governor designates him to fill a judicial position. In particular, the State asserts that at least two cases which *Begich* cited with approval, 441 P.2d at 32 n. 11, hold that the power to "employ" is not the power to grant tenure.

 We find this argument ingenious but flawed. Both the cases *Begich* cited clearly depend on the common-law rule we have rejected. Neither *Begich* nor *Johnstone* concerned anything remotely resembling the problem before us. In *Begich,* moreover we defined "appoint," not "employ." [5] We hold that the authority to em-

---

**4.** Art. II, section 5 provides:

 *Section 5. Disqualifications.* No legislator may hold any other office or position of profit under the United States or the State. During the term for which elected and for one year thereafter, no legislator may be nominated, elected, or appointed to any other office or position of profit which has been created, or the salary or emoluments of which have been increased, while he was a member. This section shall not prevent any person from seek-

ing or holding the office of governor, secretary of state, or member of Congress. This section shall not apply to employment by or election to a constitutional convention.

**5.** If "employ" actually meant what the State says it means—the mere act of designating a particular person for a particular job—we would not have referred to contracts of employment as often as we have over the years. *See, e.g., Mitford v. de Lasala,* 666 P.2d 1000 at 1006,

ploy necessarily includes the power to hire by means of a contract of employment. Thus, the Board's decision to give Zerbetz a three-year contract did not go beyond, and is not inconsistent with, its power to "employ and determine the salary of an executive director."

## II. DOES THE FACT THAT ZERBETZ' POSITION WAS IN THE "EXEMPT SERVICE" MEAN THAT THE BOARD LACKED THE AUTHORITY TO GIVE HIM JOB SECURITY?

Even if the Board would otherwise have had the power to hire Zerbetz for a term of years, the State argues, by statute he was in the "exempt service", established in AS 39.25, and employees in the exempt service are employees at will. The State contends that

[t]he hallmarks of the exempt service are skill, judgment, confidence and trust. This is apparent in the kinds of positions included: governor, legislators, judges, commissioners, directors, and other confidential positions.... As such, exempt officers and employees are ... subject to summary dismissal without cause....

The problem with this argument is that the "exempt service", as the statute defines it, does not mean what the State says it means. Along with legislators, judges and commissioners, the exempt service includes all employees of the Alaska Court System and the Legislature; all employees of the University of Alaska; all employees of a regional educational attendance area; all patients and inmates employed in State institutions; and, last but not least, all employees of the Alaska Energy Center. *See* AS 39.25.110(2), (3), (5), (6), (8), and (11)(C).[6]

1007; *Breeden,* 628 P.2d at 926; *Skagway City School Board v. Davis,* 543 P.2d 218, 221 (Alaska 1975); *Preferred General Agency of Alaska, Inc. v. Raffetto,* 391 P.2d 951, 953 (Alaska 1964).

**6.** These references are to the current version of AS 39.25.110. In 1981, just after the Legislature created the Energy Center, this statute read as follows:

Sec. 39.25.110. *Exempt service.* The following positions in the state service constitute the exempt service and are exempt from the provision of this chapter and the rules adopted under it:

(1) persons elected to public office by popular vote or appointed to fill vacancies in elected offices;

(2) justices of the supreme court, judges of the superior court, judges and magistrates of other state courts established by law;

(3) the administrative director and all other employees of the state court system, and employees and members of the Judicial Council;

(4) the chief administrative officer of each house of the legislature;

(5) all employees of the state legislature and its agencies;

(6) the head of each principal department in the executive branch;

(7) officers, members of the teaching staff, and employees of the University of Alaska;

(8) certified teachers employed by the state to teach in schools operated by the state;

(9) patients and inmates employed in state institutions;

(10) persons employed in a professional capacity to make a temporary and special in-

quiry, study, or examination as authorized by the governor, the legislature, or a legislative committee;

(11) members of boards, commissions, or authorities, except as otherwise provided by law;

(12) personnel employed by the division of marine transportation as masters and members of the crews or vessels who operate the state ferry system and who are covered by collective bargaining agreements provided in AS 23.40.040;

(13) commissioners of the Alaska Public Utilities Commission;

(14) the executive officer of the Alaska Commission on Postsecondary Education;

(15) commissioners and employees of the Alaska Commercial Fisheries Entry Commission;

(16) the ombudsman and his staff;

(17) the members, executive secretary and legal counsel of the Alaska Municipal Bond Bank Authority;

(18) certified teachers and noncertified employees employed by a regional educational attendance area established and organized under AS 14.08.031—14.08.041 to teach in, administer or operate schools under the operation, control and management of a regional educational attendance area school board;

(19) licensed physicians, as defined in AS 47.30.340(9), employed by the division of mental health and development disabilities, Department of Health and Social Services;

(20) petroleum engineers and petroleum geologists employed in a professional capacity by the Department of Natural Resources ex-

It would be unsound to assume that none of the agencies the statute lists has the power to give its employees job security.

 The "exempt service", in our view, is a category of jobs which, for whatever reason, the Legislature wanted to exclude from the state personnel system.[7] Not every person in the exempt service is a confidential employee. The fact that Zerbetz was in the exempt service does not mean that the Alaska Energy Center lacked the power to give him a three-year contract.

### III. DOES THE FACT THAT NO APPROPRIATION NOW EXISTS TO COVER CLAIMS MADE UNDER THE CONTRACT MEAN THAT ZERBETZ' CONTRACTUAL CLAIMS ARE BARRED?

The appropriations intended to cover the Energy Center's contracts have lapsed. The State asserts, and Zerbetz now concedes, that his contract does not give him an automatic right to damages. Article IX, section 13 of the Alaska Constitution provides:

> *Expenditures.* No money shall be withdrawn from the treasury except in accordance with appropriations made by law. No obligation for the payment of money shall be incurred except as authorized by law. Unobligated appropriations outstanding at the end of the period of time specified by law shall be void.

AS 37.05.170 implements this constitutional provision:

> *Obligations.* No payment may be made and no obligation incurred against any fund unless the Department of Administration certifies that its records disclose that there is a sufficient unencumbered balance available in the fund and that an appropriation or expenditure authorization has been made for the purpose for which it is intended to incur the obligation.

Phrasing its contentions in terms of conditions precedent, the State argues that a party to a State contract cannot recover on it unless an appropriation exists to support the recovery. Appropriations, the State says, are usually made for one-year periods. A contract like Zerbetz', which purports to bind the State for three years, cuts against the usual appropriation policy. Claims made under the contract, the State concludes, can have no legal effect unless and until an appropriation exists to cover them.

 Zerbetz concedes that he cannot force the State to pay him. But he draws a distinction between the question of the contract's validity and the ways in which he might enforce it. A three-year contract, he says, gives rise to valid claims. But the State can refuse to pay those claims, pursuant to the constitutional and statutory provisions quoted above. The decision on this kind of question, he contends, is one the Legislature should make pursuant to AS 09.50.270:

> AS 09.50.270. *Payment of judgment against the state.* No attachment or execution shall issue against the state. When a final judgment is rendered against the state in an action, the clerk of the court shall immediately transmit a certified copy of the judgment to the Department of Administration which shall either approve payment of the judg-

cept for those employed in the division of geological and geophysical surveys;

(21) employees of the Alaska Gas Pipeline Financing Authority;

(22) members of the board of trustees, the executive director, and staff of the Alaska Permanent Fund Corporation;

(23) the executive director and other employees of the Alaska Industrial Development Authority;

(24) officers, agents, and employees of the Alcoholic Beverage Control Board granted limited peace officer powers by the Alcoholic Beverage Control Board under AS 04.06.110;

(25) employees of the Alaska Energy Center;

(26) employees of the Alaska Seafood Marketing Institute.

**7.** "The thrust of the exemptions is to provide for those public employees who are not susceptible to ordinary recruiting and examining procedures." *Hafling v. Inlandboatmen's Union of the Pacific,* 585 P.2d 870, 875 (Alaska 1978).

ment against the state if a sufficient appropriation exists for payment, or audit the amount and transmit a copy to the legislature with the recommendation that an appropriation be made for its payment.

Thus Zerbetz resists the argument that a contract is only good if one can be assured of damages for its breach. We agree with his position. Assuming for purposes of argument that his contract is otherwise valid, we hold that even though no appropriation exists to cover the contract's obligations, Zerbetz is entitled to ask the State for payment pursuant to AS 09.50.270. Zerbetz properly relies upon a statute which gives him a specific, albeit uncertain, remedy: the chance to have his claim presented to the Legislature.

## IV. IS THE CONTRACT VOID AS AGAINST PUBLIC POLICY?

Having established that the Energy Center had the power to enter into a multi-year contract, we must now decide if the contract on which the parties agreed is void as against public policy. Some of its provisions are clearly invalid. Others, standing alone, might not be. The most difficult question before us is whether the invalid provisions destroy any right Zerbetz might have to recover on the provisions which might otherwise be valid. For the reasons that follow, we hold that they may, and remand so that the superior court can decide if they do.

### A. The Provisions Limiting The Board's Authority Over Zerbetz and Allowing Zerbetz to React to Intrusions on His Authority by Suing for His Full Salary Are Void.

In itself, we see nothing wrong with a contract setting out an executive director's responsibilities to the agency he serves. In this regard paragraph 2 of this particular contract is unobjectionable.[8] It required Zerbetz to make personnel decisions, establish offices, act as agent for the Center, execute contracts, prepare publications, and make various reports and suggestions to the Board. What is objectionable, in our view, is the suggestion in the contract that the Board, having assigned Zerbetz these duties, was forbidden to interfere with the way in which he performed them. Zerbetz could consider the contract terminated and sue for the balance of his salary, according to paragraph 9, "upon the happening of any of the following events":

(i) Amendment of AS 46.12 or action by the Board or the State reducing the authority or increasing the responsibilities of the Executive Director under AS 46.12 or set forth in this Agreement;

. . . .

(iii) Reducing the level of employees of the Center without the consent of Zerbetz; [and]

(iv) Failure of the Board to approve to the extent necessary the hiring, termi-

---

8. Paragraph 2 provides:
2. *Duties.* Zerbetz, in his capacity as Executive Director, shall have the duties and responsibilities established by AS 46.12 and as set forth by the Board in this Agreement, including, but not limited to, the following:
(a) Select, employ, terminate employment of and establish salaries and emoluments for staff of the Center;
(b) Establish the offices of the Center at locations and with staffing levels and classifications deemed necessary by Zerbetz;
(c) Act as agent for the Board in the performance of the powers and duties of the Board under AS 46.12;
(d) Act as agent for service of process upon the Board;
(e) Execute and accept grants, contracts, leases, employment agreements, consulting agreements, and any other documents on behalf of

the Board and necessary to the performance of the powers and duties of the Board and the Executive Director under this Agreement and AS 46.12;
(f) Suggest to the Board regulations and by-laws for the exercise of the powers and duties of the Board;
(g) Prepare and send to the Board by the tenth day of February, April, June, August, October and December of each year an activity report of the Center;
(h) Prepare and distribute publicity, advertisements, notices, and other publications deemed necessary and appropriate by Zerbetz; and
(i) Prepare and submit to the Board for its approval the annual report of the activities of the Board for distribution to the Legislature of the State of Alaska in accordance with AS 47.12.140[.]

nation, classification or numbers of employees of the Center deemed appropriate by Zerbetz[.]

Nor was this all. The Legislature's discretion was also to be limited. The act of "[r]educing the budget of the Center for any fiscal year to the level below $3,000,-000," according to subsection 9(a)(ii), also justified a decision by Zerbetz to consider the contract terminated and sue for the balance of his three-year salary.[9]

■ We conclude that subparagraphs 9(i), (iii), and (iv), which gave Zerbetz a financial weapon with which to defend himself against Board encroachments on his authority, constituted an abdication of authority on the part of the Board. To the extent that Zerbetz is attempting to enforce these provisions, we hold that he cannot do so.

A review of the relevant statutes shows that the Legislature intended the Board, not its executive director, to have ultimate authority over the Center's operations. The Board was to be the Center's "governing body." [10] It, not the executive director, had authority to exercise the powers listed in AS 46.12.110. It, not the executive director, was responsible for performance of the duties listed in AS 46.12.120. Preparation of an annual report and establishment of branch offices were additional Board responsibilities.[11] Board members, not their employees, were to be appointed by the Governor and Legislature and removed, if necessary, by the same.[12] They were thus accountable to the political process in ways their executive director was not. We think the Board could delegate some of its powers and responsibilities to Zerbetz, but we do not think it could contractually give up its ultimate authority over the way those powers and responsibilities were exercised. Because the provisions at issue here insulated Zerbetz, a Board employee, from the Board's control, they undercut the authority the Legislature granted to the Board. By doing this, the provisions violated the public policies inherent in AS 46.12.

In our view, two of Zerbetz' three arguments on this issue miss the point. First, he contends that if the Legislature had authorized the Center to enter into this particular contract, the contract cannot be void as against public policy. If this is true, it is nevertheless irrelevant as the Legislature did not consider this particular contract when it established the Center.[13] Second, he argues that this court should not scrutinize the Center's contracts any more closely than it would a private corporation's, basing this contention on the assumption that the Center was not to act in a "governmental sovereign capacity." His assumption is incorrect. "Exercise by the center of the powers conferred by this chapter," AS 46.12.010 provides, "is an essential governmental function of the state." Assuming for purposes of argument that this statement is subject to challenge, we note that Zerbetz has not challenged it.

Zerbetz' more meaningful argument is that the contract did not in fact inhibit, and was not intended to inhibit, the Board's exercise of its authority. The question before us, however, is not what effect the parties intended their contract to have, or what effect it eventually did have. The question is what effect, viewed objectively, it was likely to have. "The test of public policy is not what the parties did or contemplated doing in order to carry out their agreement, or even the result of its performance; it is whether the contract as made has a 'tendency to evil,' to be against the public good, or to be injurious to the public." *Golberg v. Sanglier*, 27 Wash. App. 179, 616 P.2d 1239, 1247 (1980), *re-*

---

**9.** We discuss the two other provisions which triggered a similar right in the next subsection of this opinion.

**10.** AS 46.12.030(a).

**11.** *See* AS 46.12.140 and 150.

**12.** *See* AS 46.12.030 and 050.

**13.** It is possible that Zerbetz is arguing that if the Center had authority to enter into employment contracts, all contracts it entered into must by definition have been valid. If this is the argument, it is meritless.

*versed on other grounds,* 96 Wash.2d 874, 639 P.2d 1347 (1982), *opinion changed,* 647 P.2d 489 (Wash.1982). *See also Wunschel Law Firm v. Clabaugh,* 291 N.W.2d 331, 335 (Iowa 1980); *Hazelwood v. Mandrell Industries Co.,* 596 S.W.2d 204, 206 (Tex. Civ.App.1980). It is the contract's tendency to inhibit the Board which is objectionable.

Government agencies with six-million-dollar budgets do not needlessly expose themselves to three-hundred-thousand-dollar liabilities. Zerbetz' contract gave him a uniquely privileged position: decisions encroaching on his authority, unlike all other decisions the Board could have made, forced the Board to risk not only losing its executive director but also risk paying that director the balance of his three-year salary. In any disagreement with the Board Zerbetz would have had an automatic advantage. Although, as he points out, the contract did not forbid the Board to exercise its authority, it penalized some decisions and rewarded others. We hold that the provisions which insulated Zerbetz from the Board's control—subparagraphs 9(a)(i), (iii) and (iv) of the contract—violated public policy.

 Nor can we approve subparagraph (ii), which allowed Zerbetz to sue for the balance of his salary if the Legislature set the Center's budget below $3,000,000. In practical terms this provision was likely to have had less effect on the Legislature than the other provisions were likely to have had on the Board. However, this subparagraph does have a "tendency" to limit legislative control over the Board and its executive director.[14] In deciding how to accomplish the goals it assigned to the

Center, the Legislature would, each year, have had to allocate limited resources. The possibility of substantial liability to Zerbetz was likely, all other things being equal, to have distorted the balance the Legislature might otherwise have struck. Moreover, if the Legislature had reduced the budget to, say, $2,500,000, liability under the contract would have constituted a significant restriction on the Center's other operations. Thus, we hold that this provision, too, violated public policy and is unenforceable.

B. Standing Alone, Is The Provision Allowing Zerbetz to Collect His Full Salary On Termination or Attempted Reduction of Benefits Valid?

 Under the contract, two other events would empower Zerbetz to declare the contract terminated and receive payment of the balance of his salary:

(v) Giving Zerbetz thirty (30) days notice of termination of this Agreement, notwithstanding that such notice may be given for cause; and

(vi) Reducing retirement system benefits, vacation time or other benefits afforded under this Agreement.

On this record, we cannot conclude as a matter of law that these two provisions are invalid. Both concern matters basic to job security; neither, in our view, tends to encroach on the authority the Legislature retained or granted to the Board.[15]

 The notice-of-termination provision deserves further comment. The State argues that this provision, linked to the clause requiring payment of full salary and benefits, constitutes a penalty for breach

---

**14.** This tendency is equally pronounced in subparagraph (i), which allows any "[a]mendment of AS 46.12" to trigger Zerbetz' right to sue for the balance of his salary.

**15.** It is true that in AS 46.12.100 the Legislature required the Board to "determine the salary" of the Center's executive director. It is at least arguable that the power to determine a salary is the power to reduce it, once initially determined, and that for this reason a clause allow-

ing Zerbetz to sue for the balance of his salary following an attempt to reduce that salary would transgress the Board's statutory authority. However, the two provisions now before us do not explicitly discuss salary, and whether or not "salary" is one of the "other benefits afforded under this Agreement" seems to us a matter best determined after the taking of extrinsic evidence. None has yet been taken, and we leave initial consideration of this problem to the superior court.

of contract and is thus void.[16] It claims that a penalty, not a liquidated damages clause, is at issue here. Liquidated damages clauses are proper, we have held,

> where "it would be difficult to ascertain actual damages," and where the liquidated amount [is] "a reasonable forecast of the damages likely to occur in the event of breach."

*Williwaw Lodge v. Locke*, 601 P.2d 236, 239 (Alaska 1979), *quoting Merl F. Thomas Sons, Inc. v. State*, 396 P.2d 76, 79 (Alaska 1964). Here, the State says, Zerbetz's actual damages would have been easy to ascertain and the contract's estimate is unreasonable.[17]

Yet Zerbetz argues, relying on *Bramhall v. ICN Medical Laboratories, Inc.*, 586 P.2d 1113 (Or.1978), that these provisions were not intended to be liquidated damages clauses. He claims that they were meant to compensate him for the security and benefits he gave up when he left the Alaska Public Utilities Commission, and thus characterizes the clause in question as a "minimum payment clause".[18]

We think resolution of this issue may well depend on evidence not now in the record. Nothing before us indicates what compensation and benefits Zerbetz gave up when he left the APUC. He has described that position as having "substantial value," but has not yet provided specific information as to what that value was. More important, we think, is the fact that the parties' motives in agreeing to these provisions have not been examined in any detail.

It is of course possible that a provision which may be a liquidated damages clause is in fact merely an alternative way for a promisor to perform; but, as the drafters of the Restatement (Second) of Contracts have pointed out,

> [S]ometimes parties attempt to disguise a provision for a penalty by using language that purports to make payment of the amount an alternative performance under the contract.... Although the parties may in good faith contract for alternative performances ... a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable.... In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive.

Restatement (Second) of Contracts § 356, comment c (1981). Despite the drafters' suggestion that "the parties' actual intention as to its validity ... is [not] significant in determining whether the term is valid," *id.*, we think the test the drafters outline, with its references to "disguise" and "good faith," clearly calls for an inquiry into actual intention. *Cf.* 5 Corbin on Contracts § 1058, at 337–45 (1962) (intention is not the *only* thing a court should consider). Because the "surrounding circumstances" are important, *id.* at 339, we remand so that the superior court may determine what those surrounding circumstances were. *Cf. Equitable Lumber Corp. v. IPA Land Development Corp.*, 38 N.Y.2d 516,

---

**16.** It makes the same argument with respect to the subsections we have just held invalid. Because those subsections' legal infirmities are clear, penalties or no, we have chosen to address the penalty argument in this subsection of our opinion.

**17.** *See Skagway City School Board v. Davis*, 543 P.2d 218, 225 (Alaska 1975): "The normal rule is that a wrongfully discharged employee is entitled to the total amount of the agreed upon salary for the unexpired term of his employment, less what he could earn by making diligent efforts to obtain similar employment."

**18.** Zerbetz also contends that if paragraph 9 is held to be a liquidated damages clause, it is valid. In part, we disagree. Amounts due un-

der that paragraph clearly exceed the ordinary measure of damages for breach of an employment contract. *See Skagway City School Board v. Davis*, quoted at note 17 *supra*. But Zerbetz claims the paragraph recognizes special hardships he would have suffered on termination, among them the loss of a secure position with the APUC; his actual damages, he says, would have been greater than the ordinary measure suggests. We must assume, given this case's procedural posture, that he is correct. On remand, the superior court's analysis of this problem should probably parallel its analysis of the arguments based on *Bramhall.*

381 N.Y.S.2d 459, 344 N.E.2d 391, 397 (N.Y.1976) (remand for factual inquiry into reasonableness of liquidated damages provisions).

### C. Do the Provisions Which Are Void Vitiate any Obligations Created by the Provisions Which May be Valid?

Zerbetz argues that even if parts of his contract were invalid he would nevertheless be able to receive his full salary by relying on the parts that were sound. He claims that he received a termination notice from the State; the significant subsection in the contract, then, was subparagraph 9(a)(v), which provided that notice of termination justified a demand for the balance of the salary due under the contract. Other provisions, including the ones we have just held void as against public policy, would therefore be irrelevant, because in order to recover Zerbetz would not need to base a claim on them. The State's response to this argument is that this subparagraph, also violated public policy. The State does not contend that even if subparagraph 9(a)(v), standing alone, would be valid, its connection to the invalid contractual provisions made it invalid as well.

■ We think this issue, which has not been fully developed by the parties, it important and perhaps determinative. On remand Zerbetz may be able to show that on this case's facts subparagraph 9(a)(v) applies and that it is not void as a penalty. If he does this, the superior court will then have to determine whether the subparagraph is void for still another reason. Illegal or improper bargains may have legal or proper components. In some cases, a valid contractual provision is enforceable even if other parts of a contract are not. In other cases the whole contract must fall. Which category of cases this case falls into is not something we can now resolve as a matter of law. We can, however, offer some guidance to the superior court before it begins its inquiry.

Restatement (Second) of Contracts § 184(1) (1981) provides in pertinent part:

(1) If less than all of an agreement is unenforceable ..., a court may ... enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.

Among other things, then, the superior court may have to decide whether subparagraphs 9(a)(i), (ii), (iii) and (iv) were "an essential part of the agreed exchange," and whether Zerbetz engaged in "serious misconduct." The commentary to this section sets out one reason why "an essential part of the agreed exchange" is important:

[A]n agreement may be unenforceable as to corresponding equivalents on each side but enforceable as to the rest. If it is not possible to apportion the parties' performances in this way so that corresponding concessions are made on both sides, a refusal to enforce only part of the agreement will necessarily result in some inequality. If the performance as to which the agreement is unenforceable is an essential part of the agreed exchange, the inequality will be so great as to make the entire agreement unenforceable. Under Subsection (1), however, if that performance is not an essential part of the agreed exchange, a court may enforce all but the part that contravenes public policy. For example, a promise not to compete that is unreasonably in restraint of trade will often not invalidate the entire agreement of which it is a part. Whether the performance is an essential part of the agreed exchange depends on its relative importance in the light of the entire agreement between the parties.

Restatement (Second) of Contracts § 184(1), comment a (1981).

■ Another reason also deserves emphasis. In general, courts try to give effect to agreements the parties have made, not to agreements the parties have not made but that the courts think would have been just. If parts of an agreement violate public policy, the "agreement" which re-

mains after those parts have been excised may or may not seem to "result in some inequality." Even if it does not, it is still not the agreement the parties made. If a provision that the court must excise is an "essential part of the agreed exchange," the court cannot be sure that in that provision's absence the parties would have agreed at all. In that case the court should not enforce what remains of the agreement.[19]

■ "Serious misconduct" is important for rather different reasons. There are no definite rules governing when contracts which are partially invalid will nevertheless be enforced. In practice, Professor Corbin says, "the court is in fact rendering its decision on the basis of its judicial instinct for 'justice' or of some inarticulate major premise as to the requirements of 'public policy.'" 6A Corbin, *supra*, § 1520 at 755. If partial enforcement will in fact further a party's illegal or improper purpose, partial enforcement should be denied. *See, e.g.*, 6A Corbin, *supra*, § 1390 at 77 (discussing a purpose to create a monopoly, suppress competition, or control prices). If misconduct is not serious, courts should be more inclined to rescue and revise the parties' bargain.

Two relatively recent decisions have dealt with contracts which were, in our opinion, considerably easier to judge than Zerbetz's. In *Hughes v. Schaefer*, 294 Md. 653, 452 A.2d 428 (1982), loan agreements between the City of Baltimore and private citizens provided that the City would not approve certain contracts unless two designated trustees recommended those contracts favorably. These provisions were,

the Maryland court held, an unlawful delegation of city power. The underlying agreements, however, were nevertheless valid: the invalid provisions' purpose, the court said, "is incidental when the agreements are viewed as a whole." 452 A.2d at 433. In *Nathan v. Tenna Corp.*, 560 F.2d 761 (7th Cir.1977), more serious misconduct was involved and seemingly legal transactions were hard to separate from illegal ones. The plaintiff had procured contracts for the defendant, in return for commissions; some of the commissions, in turn, went in the form of kickbacks to a buyer for the company with which defendant was contracting. Noting that plaintiff's misconduct had been serious, the Seventh Circuit declined to enforce any of the commission agreements, even those which had not led to kickbacks. 560 F.2d at 764–65.[20]

■ The contract at issue here is harder to classify. Because the superior court decided this case before significant discovery had been conducted, we cannot be certain that the terms we have held void were "an essential part of the agreed exchange." Nor can we hold, as a matter of law, that they were not. Extrinsic evidence, not now in the record, may establish which of its provisions were essential. An inquiry into Zerbetz' attempts to negotiate this contract may show whether or not his misconduct, if any, was serious. At present, all we have before us is a contract, a collection of affidavits, and the parties' legal arguments. This record provides us with little information about anyone's motives and priorities. Although this sort of information is not necessarily relevant when one tries to interpret a contract, it is

**19.** "[I]f it appears that there would have been no contract made without the illegal portion," one court has observed, "then the striking of it strikes out the entire contract." *Dalton, Dalton, Little, Inc. v. Mirandi*, 412 F.Supp. 1001, 1003 (D.N.J.1976).

**20.** *See also Neil B. McGinnis Equipment Co., v. Riggs*, 4 Ariz.App. 556, 422 P.2d 187, 189 (Ariz. App.1967) (invalid repurchase clause too closely "entwined" with other clauses for those other clauses to be enforceable); *Kukla v. Perry*, 361 Mich. 311, 105 N.W.2d 176, 182 (1960) (illegal convenant an essential part of mortgage and

loan agreement); *Indianhead Truck Line v. Hvidsten Transport, Inc.*, 128 N.W.2d 334, 345 (Minn.1964) (contract action did not involve or depend in any way on overbroad covenant not to compete); *Jones v. Gabrielan*, 52 N.J.Super. 563, 146 A.2d 495, 499 (A.D.1958) ("Disregard of the illegal provisions of the contract in question will surely not defeat its primary purpose"); *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521, 531 (1973) (minimum price provision not affecting plaintiff did not bar recovery on rest of contract).

certainly relevant when one makes the inquiries called for by Restatement (Second) of Contracts § 184. On remand, the superior court will be in a better position than we now are to make this inquiry, if, in fact, it reaches this question.

CONCLUSION

Three different questions may thus await determination at the trial level. First, the superior court must decide if subparagraph 9(a)(v) is applicable. If it is, the court must then decide if it is void as a penalty. If it is not void as a penalty, the final question will be whether it is nevertheless too closely bound up with sufficiently objectionable contractual provisions to be enforceable.

The superior court's decision is therefore REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

COMPTON, Justice, dissenting.

I dissent.